**NORFOLK DREDGING COMPANY**

v.

**The UNITED STATES.**

No. 375–61.

United States Court of Claims.

May 13, 1966.

Francis N. Crenshaw, Norfolk, Va., for plaintiff. Guilford D. Ware, Norfolk, Va., attorney of record. Baird, Crenshaw & Lanning, Norfolk, Va., Kirlin, Campbell & Keating, and Robert E. Kline, Jr., Washington, D. C., of counsel.

Herman Wolkinson, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

PER CURIAM.*

Through the medium of an assignment of errors [1] the plaintiff asks the court to find that a decision of the Corps of Engineers Board of Contract Appeals was arbitrary, capricious, or not supported by substantial evidence in eight partially overlapping particulars. The dispute involves the plaintiff's 1954 contract to

---

* This opinion is based, with changes and added discussion, on the opinion prepared, at the direction of the court, by Trial Commissioner C. Murray Bernhardt.

1. A procedure not affirmatively sanctioned by the Rules of Court but adopted as a practical and permissible means of de-

fining errors in the administrative proceedings for purposes of judicial review. In this instance it was ordered over the objection of plaintiff, which demanded a *de novo* trial. The administrative record proved to be deficient in non-vital respects, although adequate for review purposes.

build the Craney Island Disposal Area at Hampton Roads, Virginia, consisting of six miles of revetted retaining levee, three sluiceways, and an access road. The levee was constructed of hydraulic fill pumped from adjacent borrow areas designated and owned by the Government. It confines a two-mile square body of tidal water by two parallel levee legs extending north from the Craney Island shoreline two miles and linked at the north end by a third two-mile leg. The project was unique because of its size and its situs in tidal waters. It had been authorized by statute in 1948 and in the intervening years the design was perfected, extensive foundation investigations were made, and the borrow areas were located and analyzed.

The borrow material was to be deposited in such a way as to achieve certain cross-section levee dimensions prescribed by the specifications. In general, the cross-section shape was a shallow cone or inverted V rising from a broad base to a narrowed width of 150′ at the level of mean low water (MLW) and having a crest elevation of +5′ MLW, exclusive of the roadway on top. The side slopes were to follow designated gentle angles from crest to bottom with plus and minus tolerances. The Government considered the slope design to be achievable under the existing conditions, i. e., the bottom, the borrow, the tidal currents, and the weather. The base ranged in width from 210′ in water 2′ deep to 940′ in water 14′ deep; the deeper the water the broader the base. The levee was to be revetted with riprap down to —1′ MLW and topped by a paved roadway.

The Government estimated that the levee would require 7,714,000 cubic yards of hydraulic fill for the placement of which plaintiff was to be paid at the unit price of $0.26 per yard removed from and measured at the borrow areas, with the provision that "Any material lying above or beyond the plus tolerances on the drawings will be deducted as excess material." In other words, the plaintiff was not to be paid for misplaced fill, except that which deposited beyond the lateral extremities of the base.

The contract was awarded June 28, 1954 and was completed May 31, 1957, with the benefit of time extensions. On August 19, 1954, the plaintiff commenced placing fill at station 26 [2] and by August 26 had completed the 2,600 feet of fill from that point southward to the shoreline. Little difficulty was encountered in that segment for the water was shallow (2′ maximum depth) and the bottom was a sand shelf offering firm support for the fill. However, the deductions for fill material beyond the pay limits of the slopes averaged 3,148 cubic yards per 100-foot station. Whether this was the result of plaintiff's failure to control dispersion of the fill, or the result of a hurricane cannot be determined.

The fill was pumped from the borrow areas by pumps mounted on dredges and thence conveyed by a large diameter pipeline to the site. The method of procedure was to place a single pipeline, or double and even triple parallel pipelines, on the first stage of levee built above water and to add pipe in 50-foot lengths as the fill built up ahead of the discharge end of the pipeline. This is a normal procedure and is commonly referred to as a "fixed shore pipeline".

Starting at station 26 on August 26, plaintiff began placing fill northwardly along the west leg of the levee by discharging borrow from the pipeline lying on the levee already raised above water in the manner stated. Progress was good until about station 30, when the sand or shelf bottom gave way to a bottom of fine, soft marine clay in water about ten feet deep which was more exposed to tides and currents. Settlement or penetration of the hydraulic fill into the soft bed of marine clay was experienced to depths

2. The levee was divided into 100-foot segments for locational purposes, starting with station 0.00 at the shore end of the western leg and proceeding clockwise to station 303/90 at the shore end of the eastern leg. Accordingly, station 26 was 2,600′ from the shore end of the western leg

of around 30 feet, displacing and upheaving the bottom in large "mud waves" surrounding the point of discharge. The levee advanced from stations 30 to 38 during September, to station 44 by the end of October and to about 51 by November 29, 1954, accompanied by the mud wave formation. Progress was also impeded during this period by hurricane Hazel which struck the area in October, delaying and damaging the work.

The average deduction per station from 26 to 51 was 12,656 cubic yards. The settlement of fill into the soft bottom and the deductions from pay quantities were considered excessive by both the contractor and the Government. The contractor complained of the losses in pumping nonpay yardage and the Government complained of the possible exhaustion of suitable borrow from the approved borrow areas and the hindrance to progress in wasted pumping.

These matters were the subject of several informal conferences from September 18 to early November, during which some curative expedients were discussed, including a proposal by the contractor to spread a foundation bed of fill across the levee sections more evenly by discharging from a pipeline floating on pontoons and constantly swinging back and forth across a wider portion of the levee section than was possible from a shore pipeline. This method was called the floating, swinging pipeline in distinction to the shore pipeline lying upon the levee.

The plaintiff believed at the time that it was the first to conceive the use of a floating pipe on such work, and contends that the Government personnel rejected it three times as being too radical and not in conformance with the specifications. The Government denies that the floating pipeline was novel, having been used for years in building levees on the Mississippi River and less frequently elsewhere, but admits that its employment on a levee of this magnitude in open tidal waters was unprecedented to its knowledge; and the Government also denies having initially rejected a floating pipeline as violative of the contract require-ments, or for any other reason. Plaintiff's assertion does not outweigh defendant's denial.

On November 12, 1954, the contracting officer wrote plaintiff that while placement of hydraulic fill from stations 26 to zero was satisfactory, the results obtained in recent weeks were not, "in that the material removed from the borrow pit is not being adequately dispersed on the levee section." He, therefore, directed the contractor to find and put into effect "proper corrective methods" to "spread the material," on pain of suspension of the work.

Plaintiff replied on November 23, reciting its use of bleeder pipes, spoons, baffles, and single and parallel discharge lines to control the placement of fill from station 26 north, all of which are conventional methods or devices mentioned in the specifications. It said that the Government representatives on the job had instructed plaintiff to continue in this manner. It then advised that a floating discharge line was ready for use and should secure better results in the depositing of the fill material.

The floating line was put into operation at station 51 on November 29, 1954. The excessive settlement of fill with consequent mud wave formation immediately ceased. With a few minor exceptions the settlement of fill into the marine clay bottoms was contained within three feet, and averaged 2.8 feet for the remaining five miles of levee as against plaintiff's expectation of a seven-foot average settlement. The Government's design data actually indicated an average three-foot settlement in marine clay bottoms, and a seven-foot settlement over the 22 year life expectancy of the levee project. But the contractor states it understood from a prebidding conference that the seven-foot settlement would occur during the 790-day period of construction.

Average deductions of fill measured above and beyond the tolerance limits fell to 3,952 cubic yards per station, and as low as 811 cubic yards, between stations 51 to 121 in water from 10 to 13 feet deep. From station 51 to completion

at station 303 the levee fill was placed principally by a combination of floating and shore pipelines in a manner hereinafter described, and without delay, so that the levee was completed in the scheduled time, as extended for extra or supplemental work and the occurrence of some severe hurricanes and storms.

Deductions for nonpay quantities, however, rose to an average of 7,943 cubic yards from stations 121 to 303 and totaled 2,112,638 cubic yards for the entire levee. This quantity, subtracted from the total of 7,896,665 cubic yards removed from the borrow areas, left only 5,784,027 cubic yards within the pay lines along the plus tolerance slopes and across the bottom of the levee sections as defined by the contract specifications and drawings, or 1,929,973 less than the estimated pay quantity of 7,714,000 cubic yards.

The plaintiff first drew formal notice to the alleged excessive deductions for nonpay quantities in a letter of February 2, 1955, in which it stated that since use of the floating pipeline began on November 29 the rate of levee placement had greatly improved and had then covered a distance of 1,200 feet; however, while the volume of material pumped from the borrow area was quite close to the estimated volume, the side slopes of the levee were above the design elevations, or plus tolerances resulting in excessive deductions for nonpay quantities of fill. Plaintiff, therefore, felt that "there must have existed certain latent physical conditions at the site or else the designing engineers would not have called for slopes as shown on the plans." Consequently, it asked that favorable consideration be given to "a change in the specifications and an adjustment in the deductions from our pay quantities."

The contracting officer replied on February 11, 1955, acknowledging receipt of plaintiff's request for "a change in the specifications." He evidently understood it to be a request for a change in pay provisions under the Changes clause of the contract, rather than a request for relief under the Changed Conditions clause, which does not require a change in the contract specifications. He accordingly advised that the specifications as written provide for the deductions made, and that the deductions were due to the placement methods previously employed by plaintiff. He also said that the deductions had been materially reduced by recent changes in the placement method which were still within the scope of the specifications. Further reductions were possible, he believed, through more definite control measures by plaintiff.

The project proceeded to completion on May 31, 1957, without further protest or complaint by plaintiff as to the deductions or to any latent physical conditions. On July 18, 1957, plaintiff wrote to the Government referring to its letter of February 2, 1955, and filed a claim for changed conditions, based on certain "logical conclusions" consisting briefly of these points:

(a) It was *impossible* to construct the levee north of station 30 to contract dimensions solely by the specified fixed shore pipelines because of excessive settlement of the soft bottom and consequent mud waves.

(b) The floating discharge pipeline (which plaintiff alleged was held by the Government to be prohibited by paragraph TP1–04a(3) of the specifications) was, therefore, the "only feasible and practicable means of placing the initial fill in a manner to prevent excessive settlement and mud waves", but "caused the fine materials from the borrow pit areas to be dispersed in solution and deposited in large quantities over great distances outside the allowable slopes of the finished levee."

(c) The data shown on the contract plans as to composition of the materials in the borrow areas were in error because, based on plaintiff's many years of experience, materials as shown would have stayed in solution for only a short time and would then assume slopes not to exceed 1 on 10 (slightly steeper than specification requirements) without traveling distances up to 2,000 feet.

(d) The floating discharge line saved the Government approximately 2,000,000 cubic yards in pay quantities of fill from the advertised estimate of 7,714,000 yards.

The plaintiff concluded its letter of July 18, 1957 by requesting the additional payment of approximately $600,000 for changed conditions, the amount representing (a) an adjustment in the contract unit price for materials paid for, or payment for the deducted yardage at the contract unit price, plus (b) payment on an hourly basis for lost time of the dredge and its attendant plant resulting from use of the floating discharge line, both items being subject to negotiations.

On September 17, 1957, the plaintiff refined its claim to the contracting officer by basing it on three changed conditions: misrepresentation of borrow material, misrepresentation of bottom material, and inadequacy of specified construction methods. On October 17, 1957, the contracting officer denied the claim and ruled that changed conditions did not exist, citing supporting details. The plaintiff duly appealed, and on December 21, 1959, after an extensive hearing and submission of exhibits and briefs, the Corps of Engineers Board of Contract Appeals denied the appeal, reserving, however, for equitable adjustment between the parties the plaintiff's claim for quantity variation. On June 6, 1961, the plaintiff accepted $75,000 under Modification No. 20 as an equitable adjustment for the underrun in pay quantities of fill.[3] It then filed the instant petition on September 20, 1961.

The eight errors attributed to the Board will now be discussed in somewhat the order of their listing by plaintiff:

■ 1. The Board found that the floating pipeline devised by the plaintiff did not constitute a changed condition because it was embraced by the terms of the specifications, and plaintiff realized major savings by its use. The plaintiff cites this as erroneous. Specification TP1–04a(4) provides:

The hydraulic filling shall be conducted in such a manner as to achieve a gradual building up of the base of the fill by the use of parallel discharge lines or by lateral shifting of a single discharge line. In no case shall the levee be pumped to full height with steep side slopes and allowed to slump.
* * *

The Board found, and we concur, that there is nothing in this or any other provision of the contract which prohibits, provides or mentions whether the single or parallel discharge lines shall be shore pipe or floating pipe.

The evidence shows that the floating discharge pipe consists of several (up to 10) 50-foot lengths of 22-inch pipeline with bell joints permitting lateral motion of each joint, resting on pontoons in the water in front of the levee already built, and equipped with a baffle device at the mouth of the discharge end to stop the forward thrust of the discharge and providing a means of steering or swinging the floating line from one side of the levee fill to the other.

There is nothing in any component of the floating line that is unusual to ordinary pipeline dredging. The pipe is the same 22-inch type ordinarily used. The pontoons on which it rests are the same which customarily carry pipelines over water. The baffle is mentioned in the contract specifications in TP1–04. Performance of Work. (2) *Control measures,* reading in part: "The Contractor shall use bleeder pipes, spoons, *baffles,* or *other devices* during the placing of the hydraulic fill in order to avoid excessive wash of the levees during the filling process." (Italics added.)

We agree that the contract language does not specify how the parallel or single discharge pipeline shall be supported or shifted, or whether the joints shall be flexible or rigid. "Shore" pipeline is no

3. 1,929,933 cubic yards or the difference between 7,714,000 yards which the Government had estimated the levee would require and the 5,784,027 yards actually deposited within the pay lines.

more indicated than the floating pipeline; nor for that matter, a pipeline supported on wooden cribs or bents, which is a third means of support the contractor used at will in placing hydraulic fill and which is neither "shore" nor floating.

We further agree that the floating pipeline is a means or "device" for supporting the fill conduit and does not constitute a change or an unknown or latent physical condition existing at the site within the definition of the changed condition article.

The difficulty experienced by plaintiff in placing the hydraulic fill between stations 30 and 51 with a conventional fixed shore pipeline system has been described. Even though the position of the discharge end of the line may have been moved every 15 or 20 minutes as plaintiff asserts, and even though conventional attachments such as bleeders, baffles and spoons were used to diffuse the fill as it was pumped into the levee site, the concentrated impact of the heavy fill plummeting down on the soft estuarial bottom of Hampton Roads caused the fill to sink into the ooze for as deep as 50 feet and in so doing displaced the latter and caused it to rise up above the prescribed slope elevations on either side in "mud waves". It was imperative to devise a more effective method of gradual distribution of the fill so as to minimize the disturbance to the bottom material. The plaintiff's answer to the problem in the form of a swinging floating discharge line was most ingenious and effective. The floating line consisted of several (up to 10) 50-foot lengths of 22-inch pipeline with bell joints permitting lateral motion of each joint, resting on pontoons in the water in front of the levee already built, and equipped with a baffle device at the mouth of the discharge end to stop the forward thrust of the discharge and providing a means of steering or swinging the floating line from one side of the levee fill to the other. In use it described an arc of 180° spanning a distance of 150' on either side of the center line of the levee, and while in motion sifted the fill material onto the levee site so gradually as to cause minimum disruption on the bottom as it came to rest.

While comparable devices had been used elsewhere under entirely different conditions (such as along the Mississippi River) and were not unknown to the dredging industry, their use in tidal waters was novel and displayed considerable resourcefulness on plaintiff's part. Neither the plaintiff, the defendant, nor other bidders on the contract in suit contemplated the use of such a device in doing the work, but rather all concerned anticipated the use of conventional dredging and filling methods. Undoubtedly, the framers of the quoted specification provision had in mind only the conventional devices first employed by the plaintiff, although the specification language was broad enough by description to cover the floating line. The basic disagreement seems to be that the plaintiff construes the quoted specification as a *direction* to employ only conventional equipment to achieve a gradual building up of the levee with hydraulic fill (as if it were to prohibit a novel method), or as a warranty that the desired result could be attained by use of conventional equipment, while the defendant construes it as requiring only a gradual deposition of the fill by whatever arrangement of discharge lines the contractor might deem best. There is more merit to the Government's view. Freedom of choice of means is indicated by the phrase "in such a manner", and this freedom is reenforced by the terms of Specification TP1–04a(2), which directs the contractor to use "bleeder pipes, spoons, baffles, *or other devices*" to avoid excessive wash. Before the quoted specification can be read as restrictively as plaintiff suggests it must contain a clear prohibition against the use of any device other than those enumerated in its text, and of course in this case the language used was broad enough to embrace the floating line devised by plaintiff. The mere fact that a floating line was not *specifically* in the minds of the parties at the time of bidding does not discharge the contractor's basic re-

sponsibility to achieve *a prescribed end result in whatever* manner the contract does not expressly prohibit. In engaging the services of professional levee builders through the bid process the Government acquires a reservoir of developed skills as an important part of the consideration, for as in every industry or profession a background of extensive experience is an indispensable asset in coping with contingencies. The result might be different if the only reason that conventional equipment could not accomplish the required result was that the borrow material or the bottom conditions at the levee site were so radically different from what the Government represented them to be that they compelled the use of a method of depositing the fill which was a substantial departure from the methods reasonably contemplated, but then the changed conditions would relate to other parts of the contract and not to Specification TP1–04a(3).

In this connection the plaintiff says that the Board erred in finding that the plaintiff realized major savings by using the floating line because the bottom settled or consolidated on the average of only three feet instead of seven feet expected by the plaintiff. Perhaps what the Board had in mind was that part of Specification TP1–04a(4) which would charge the contractor for excess material lying above or beyond the pay lines whether it was the result of "wash due to normal pumping operations [or] mud waves which are beyond the control of the contractor or any other causes whatsoever with the exception of submarine sand bars." If plaintiff had continued to use conventional discharge methods and to experience mud waves which rose up beyond the levee pay lines, it would have suffered heavy deductions as it did between stations 30 and 51. However, by using a floating line the plaintiff reduced the bottom subsidence to three feet as opposed to an anticipated seven feet and an actual (in some cases) 50 feet.[4] All fill material which plaintiff removed

from the borrow areas and which sank into the bottom within the lateral limits of the levee would be paid for because it would lie within pay lines. To an unascertainable extent the fill thus sinking into the bottom and entitling plaintiff to payment would displace bottom material which would surge above the pay lines in the form of mud waves and so cause deductions to be charged against the plaintiff, thus in effect offsetting some if not all of the credit. The potential credits and debits in this exchange constitute a speculative standoff, and the Board erred in ascribing "major savings" to the plaintiff in the outcome. The error, however, did not affect the ultimate ruling of the Board but merely made it more palatable.

■ 2. The plaintiff next contends that the Board erred in finding that it would have been possible for plaintiff to construct the levee using a conventional shore pipeline despite the soft bottoms encountered and the consequent mud wave formations. The basis of this finding by the Board was that from November 14 to 29, 1954, the plaintiff placed 300 feet of levee from about stations 48 to 51, using conventional shore discharge lines, and had deductions (i. e., deductions from fill pumped for fill landing outside the pay lines) of about 3,500 yards per station as compared with deductions averaging over 12,000 yards per station which the plaintiff experienced from stations 30 to at least 48. The deduction volume of 3,500 yards per station said to have been experienced from stations 48 to 51 was about the same as the deduction volume experienced in the first 30 stations on hard sand bottoms when comparatively small average deductions were experienced and before changed conditions were claimed. From this the Board concluded that it was not impossible to construct the levee using conventional discharge lines, as plaintiff had claimed, thus inferring that the conventional lines would do the job if properly controlled. The plaintiff contends that the exhibit

4. The seven feet was the Government's subsidence expectation over the life of the

levee. The 50 feet was below the normal bottom, or about 60 feet below MLW.

relied upon by the Board for the stated conclusion does not support the finding, in that the exhibit shows that at station 50 the deductions totaled approximately 10,000 yards, or close to the plaintiff's experience for the stretch of levee from stations 30 to 48, and much more than the plaintiff's deductions for the first 30 stations.

Even assuming the Government's contention that deductions at one or two of the stations between 30 and 51, while plaintiff was employing conventional discharge lines, averaged 3,500 yards per station, this reduction could as readily be attributed to brief appearance of a hard bottom at those locations, or perhaps to some other cause, as to a sudden improvement in the plaintiff's control technique which proved the adequacy of conventional methods. Such a reduction decrease might be attributable to other factors not suggested by the parties. The brief episodes of sudden improvement, even if verified, would not establish the proposition that it would have been possible to construct the levee using conventional discharge lines in any locations where the bottom was primarily composed of soft marine clay in substantial depth. The plaintiff's dramatic failure to do so in the segment of levee between stations 30 and 48, despite its strenuous efforts, rather conclusively demonstrated this impossibility. The Board's contrary conclusion rests upon such slender evidence as to lack substantial support. Even though the Board was in error in this conclusion as to impossibility, it is not decisive in the case because the plaintiff was not confined to the use of conventional discharge lines in building the levee. We have seen in the discussion under the first assignment of error that Specification TP1–04a(3) did not prohibit the plaintiff's use of a floating line, which was not a change within the definition of the "changed condition" or the "changes" articles of the contract.

3. The plaintiff assigns its third charge of error to the finding of the Board that plaintiff had not shown or attempted to show that the bottom conditions at the levee site differed from the conditions disclosed in the contract or drawings, and that the conditions did not in fact differ. The Board's decision described the bottom conditions as follows:

The soft nature of the Hampton Roads bottoms, except for about 3,000 feet of sandy shelf nearest Craney Island for both the east and west legs of the levee, was amply shown in the logs of borings on the contract plans. Borings Nos. 22 through 26 and 81 through 84 along the centerline of the proposed levee show that the top 100 feet, on average, was composed of marine clay. This material is largely sediment deposited in estuaries of rivers and by definition its particles will pass a 200 mesh sieve and are classified as "fines", as is silt, mud, sand or any other material which is not retained on a 200 mesh sieve. This material was so soft and "fluffy" that it was difficult to recover samples from its top few feet, which, when dry, weighed only about thirty five pounds per cubic foot compared with about 120 pounds for ordinary soil.

The information as to the presence and depth of the marine clay bottom beds are plainly shown on Contract Drawing No. N–10–13–06(2). Such material is susceptible to extreme settlement or subsidence under concentrated loads. This was the reason for the language in the contract specifications, TP1–04a–3, *Placement of Fill:* "The hydraulic filling shall be conducted in such a manner as to achieve a gradual building up of the base of the fill * * *", and "In no case shall the levee be pumped to full height with steep side slopes and allowed to slump."

The plaintiff does not deny that the physical composition of the material encountered corresponded to contract description, but contends that the "holding power" of the bottom material was misrepresented by implication in the specifications. The implication, construed from the specifications but not affirmatively stated therein, was that the bottom

would hold the levee if the hydraulic fill provided by the Government was placed by conventional methods, instead of which the plaintiff learned to its loss that the bottom would hold the levee only if the fill were placed by a floating line. This alleged error is merely a convoluted version of the first assignment of errors discussed above. The whole problem is that the plaintiff read the specifications as a guarantee that (a) if it placed the prescribed fill in (b) the prescribed levee areas with (c) conventional discharge lines, then the levee would automatically assume the prescribed configuration. In fact it was the plaintiff's responsibility to employ the tool *best suited* to accomplish the required ends and to assume the risks attending the undertaking. We have seen that Specification TP1–04a(3) did not limit or intend to limit the plaintiff's choice of equipment. As an experienced operator in the dredging business and in the particular coastal area which included Hampton Roads, the plaintiff is charged with awareness of the inherent difficulties in erecting with hydraulic fill a six-mile levee into tidal waters in an area where violent storms, strong currents, and heavy seas are a common occurrence.[5] It cannot now charge its underestimate of the foreseeable hazards to misrepresentation by the Government that a highly unconventional job could be done in a conventional manner. Its failure to anticipate the inadequacy of conventional discharge lines for placing the hydraulic fill was an unfortunate error in judgment, and no doubt the Government mistook as well in thinking that the job could be done in this fashion. But in accepting the award of the contract the plaintiff undertook its completion despite the entailed risks, and can escape its responsibility only upon a clearer showing of misrepresentations by the Government than it has advanced thus far, or upon proof of impossibility of performance. The Board's decision on the facts involved in this assignment of errors was amply supported.

4. The subject of another of plaintiff's assignment of errors is the Board's finding that "the only variation of the [borrow] material from the consistency called for in the specifications was that it was heavier or coarser than indicated [in the contract drawings]." In its original claim letter the plaintiff complained that the borrow material was too heavy and caused the excessive bottom settlement which occurred in the area between stations 30 and 51 before use of the floating line technique commenced. At the Board hearing the plaintiff contended that the borrow material was too light and floated out of control beyond the pay limits of the levee. Despite efforts of the plaintiff to establish the contrary at the hearing, the proof did not show any substantial variance between the actual fill and its composition shown on the contract documents. In fact, in its brief to the court the plaintiff does not contend otherwise, but claims instead that the *performance* of the fill "in tidal water where it could not be controlled was *different* than the norms to be expected from the test borings." This is explained to mean that part of the borrow fill was too light and was carried by action of the water beyond the pay limits of the levee, while other parts were too heavy and so not only could not be held by the bottom when it was deposited in a conventional manner, but tended to pile up at a steeper angle than the slope design permitted instead of leveling out at a milder angle by hydraulic action. This is an acceptable reconciliation of the plaintiff's previous ambivalence, but does not support the charge of Board error. The plaintiff had available as much in-

5. General Condition 3 of the contract, entitled "Site Investigation and Representations", provides in part: The Contractor acknowledges that he has satisfied himself as to the nature and location of the work, the general and local conditions, particularly those bearing upon * * * uncertainties of weather, river stages, tides or similar physical conditions at the site, the conformation and conditions of the ground, the character of equipment and facilities needed preliminary to and during the prosecution of the work * * *.

formation concerning the composition of the material in the borrow areas as the Government, since the knowledge of each was derived from boring logs and laboratory analyses of core borings, the results of which were accurately depicted in contract drawings. The Government specifically did not guarantee that materials other than those shown by the borrow area borings would not be encountered, or that the materials would not vary from those indicated, and warned that the depths of strata in the borrow areas shown by borings was only approximate. See Specification TP1–03, Materials.

The plaintiff's experience in building levees with hydraulic fill was presumably as extensive as that of the Government engineers who planned the project, and if the Government engineers were mistaken in thinking that the fill in the designated borrow areas was adequate for the design of the levee, the plaintiff had ample opportunity to apprehend the risk and refrain from bidding. It cannot be said that the failure of the fill to behave under tidal waters as plaintiff and the Government expected it to was a "changed condition" in as clear a sense as if the fill itself had failed to comply with contract representations as to its composition. If the fill was heavier or coarser than indicated in the contract documents, as the Board found, nevertheless the plaintiff's ability to manage the heavy elements of the fill with the floating line technique without undue settlement of the soft bottom was demonstrated, thus indicating the fault to be the plaintiff's initial selection of techniques. The behavior of the fill after placement in tidal waters at the levee site is discussed in greater detail later in this opinion.

5. The plaintiff charges another error to the Board in its failure to take testimony concerning the loss resulting from an underrun in estimated quantities. It was ultimately found that the levee contained within its pay lines only 5,784,027 cubic yards of hydraulic fill from the borrow pits instead of the 7,-714,000 cubic yards called for in the plans, or a shortage of 1,929,933 cubic

yards. The Board held, on the authority of Peter Kiewit Sons' Co. v. United States, 74 F.Supp. 165, 109 Ct.Cl. 517 (1947), and Chernus v. United States, 75 F.Supp. 1018, 110 Ct.Cl. 264 (1948), that the underrun amounted to a changed condition entitling the plaintiff to an equitable adjustment, and returned the matter to the contracting officer for disposition. Subsequently, the plaintiff accepted from the contracting officer payment of $75,-000 under Modification No. 20 "as full and complete compensation for loss of indirect costs occasioned by an underrun in estimated quantity". The plaintiff is now asking reimbursement for further losses it attributes to the underrun, namely, loss of profit and the expense of assembling and operating the floating line, although there is no indication that such alleged losses were ever submitted as such to the contracting officer for decision in connection with Modification No. 20. If they were, the plaintiff certainly never appealed a denial to the Board. Under the circumstances the plaintiff is clearly barred for its failure to exhaust administrative remedies. It is not that the Board erred; it was given no opportunity to err. Moreover, it is difficult to visualize *direct* costs in connection with work that is not performed, such as an underrun in estimated quantities. The theory of recovery for an underrun is to permit the contractor to recoup costs expended in being ready to handle larger quantities than materialize.

6. The plaintiff assigns another error to the Board's refusal to recognize changed conditions as demonstrated by (a) the underrun of fill, (b) the need for a novel method of placing the fill, and (c) the overrun of fill material. The underrun, which has been described in connection with point number 5, supra, was recognized by the Board as a changed condition and was paid for. In the discussion under point 1 of this opinion we have learned the reasons justifying the Board's decision that the need for the plaintiff to use a floating pipeline did not constitute a changed condition. Whether the overrun of fill material was

a third demonstration that a changed condition existed requires some explanation.

■ Of the 7,896,665 [6] cubic yards of fill actually removed by plaintiff from the borrow areas and pumped into the levee site, 26.75 percent (or 2,112,638 cubic yards) was not paid for because it was found to be beyond the pay lines of the levee, and the remaining 5,784,027 cubic yards was concluded to be within the pay lines and was paid for at the contract rate. The plaintiff reasons that the Board was inconsistent in finding that a 27 percent *underrun* of fill proved the existence of a changed condition deserving an equitable adjustment, while a 27 percent overrun [7] did not. Under certain circumstances a substantial overrun can derive from a changed condition warranting an equitable adjustment, but where the overrun is the plaintiff's fault or is attributable to risks affirmatively assumed by the plaintiff under specific provisions of the contract, no right to reimbursement arises.

The plaintiff had based its bid estimate on an expectation of an overrun of about 5 or 6 percent of the total amount of fill pumped from the borrow areas, while the Government had expected a 10 percent overrun, as contrasted with the plaintiff's actual overrun of 26.75 percent. The contracting officer found that the large majority of the excessive material was due entirely to the plaintiff's fault and negligence in placing the fill, and in turn the consequence of inadequate supervision. The Board made no finding as to the plaintiff's fault, negligence, or lack of supervision, but instead attributed the excessive deductions entirely to the effect of storms and hurricanes, on the basis of a dubious formula.

The Board's formula for assigning causes for the underrun was based on two major assumptions. One was that the plaintiff's experience in the first 3,000 offshore feet of the west leg of the levee represented results achievable under ideal conditions (shallow water and hard bottom) so that the deductions measured in that stretch could be projected to the entire six miles of levee to hypothesize a figure for normal deductions throughout the project.[8] The excess of actual total deductions over this hypothetical figure for *normal* deductions was then analyzed and attributed to storms and hurricanes. The second major assumption was that the known figure of 161,000 cubic yards of deductions which was determined to be the result of a particular hurricane on a particular segment of the levee was taken to represent the approximate disturbance which could be attributed to each of the other seven storms and hurricanes visiting the project, so that by multiplication the collective total effect of storms and hurricanes in producing deductions could be estimated. The coincidental closeness of the result to the net result of the first assumption lent a spurious validity to the procedure. The formula is, of course, insupportable.

In the first place it is highly questionable whether the plaintiff's experience in the first 3,000 offshore feet of the west leg of the levee represented a rate of deductions from normal causes that could safely be projected to the entire levee as the basis for a total of what could be considered normal deductions. Hurricane Edna hit the area four days after the first 2,600 feet was completed and before it was inspected and accepted, with untold effect on the dispersion of placed fill, so that an indeterminate quantity of deductions in that stretch of 30 stations could be said to result from other than normal conditions. Moreover, the volume of deductions experienced in a stretch of

6. The Board reported 7,996,665, apparently a typographical error.

7. The term "overrun" is susceptible to more than meaning, but as used here it means "more fill than anticipated deducted from payments because it was beyond pay limits of the levee design."

8. 3,148 cubic yards (average deduction per station for first 30 stations)×303 (number of stations)=953,844 cubic yards. 953,844 cubic yards÷7,798,000 cubic yards=12.23 percent, the Board's reconstructed *normal* rate of overrun.

the levee in shallow water, where the cubic size of the levee was minimal, could not be applied as a norm to other sections of the levee in deep water where its cubic size was maximal, for there is no hydraulic rule advanced by the parties which asserts such a standard. Although we are told that the average deduction per station in the first 30 stations was 3,148 cubic yards, the record does not contain a statement as to the cubic yard content designed for each station or for the 30 stations, so no exact percentage of deductions in that segment can be struck. Certainly such a percentage, if known, would be far greater than a station in deeper water having the same number cubic yards of deductions, for the designed cubic content of the deep water station would be much greater.

The second assumption underlying the Board's formula is also faulty in attributing a standard degree of fill disarrangement to each hurricane or storm *per se*. This is to credit nature with more regularity in her performance than our common sense will tolerate, and at best it can be said to gratify an instinctive urge to fortify solutions to such riddles with a set of neat figures. It is no criticism of the Board to challenge its mathematics, for anyone exposed to decisional obligations as a profession realizes that much of the time the result is merely an informed guess, and it must by nature be so.

Disagreement with the mathematical nicety of the Board's result does not prevent an agreement with the Board's general premise that storms and hurricanes were chiefly responsible for the excessive deductions experienced by plaintiff. A close analysis of Appellant's Exhibit No. 1 supports such a conclusion. The exhibit is a composite chart showing

deductions, subsidence, and data concerning storms and surveys throughout the levee in such a way as to permit certain general conclusions to be drawn. With some exceptions the occurrence of a storm or hurricane is shown to have usually coincided with an increase in the rate of deductions, indicating that storms had a pronounced effect on newly placed hydraulic fill.[9] Conversely, during periods of freedom from storms, such as between stations 51 and 120, a relatively modest rate of deductions is apparent. In fact, the percentage of deductions to the total fill in the deep water segment between stations 51 and 120 is lower than the rate in the shallow water of the first 30 stations, which weakens the plaintiff's contention that behavior of the fill in tidal water was a changed condition from that which could be anticipated. This is a complex problem, but if the plaintiff is understood correctly one could assume that less difficulty should have been experienced from fill behavior in shallow water than in deep water, because the deep water provides a greater likelihood of dispersion and lack of control of fill once it is deposited, yet the converse seems to have been true in some locations.

The contracting officer found that plaintiff's inadequate supervision and control of the job contributed to this picture, but the Board did not confirm that finding and firm support for it in the record is not enough to reach more than surmise.[10] A substantial contribution to the total deductions, and one for which the plaintiff is technically at fault for using the wrong technique, was the approximate 300,000 cubic yards outside the pay lines between stations 30 and 51 where the plaintiff not only experienced massive subsidence of the bottom from

9. The specifications provided that as the contractor completed a section of the levee of 500′ or more in length and before grading or riprapping the completed section, the Government would survey the section for the effects of storms on the completed work. On an average the Government inspected a 1,000′ section almost every month of contract performance.

10. The deduction increases shown on Appellant's exhibit No. 1 at points between stations 74 and 94, and between stations 198 and 224, cannot be attributed to storm conditions and raise a question concerning supervision and control that cannot be answered.

depositing the fill with conventional shore lines instead of a floating line thereafter employed, but also was plagued by four hurricanes and their consequences.

Government Exhibits 4 and 6 provide additional means for reconstructing the behavior of the fill once it was deposited on the levee site. The exhibits are cross-section profiles of the levee at five different stations spaced apart roughly equidistantly between stations 77 and 175. In distorted scale they diagram the tolerance lines of the levee slopes, upon which lines are superimposed the profiles of the levee slopes actually formed by plaintiff at those locations. They are supposedly typical of conditions throughout the completed levee and reveal radical departures of the actual slopes from the designed slopes, there being large areas of the hydraulic fill which are beyond the paylines and some areas where the fill is substantially below the paylines, so that the actual silhouette of the levee in typical cross-section resembles an irregular mound rather than a symmetrical cone. The cause of this asymmetrical appearance, and whether it results from changed conditions as the plaintiff maintains, is the focal issue in the case. It is understood, of course, that in all but a few forgiven instances the plaintiff was charged for the cubic yardage of fill found to be beyond the paylines, by means of deductions at the contract rate from the pay yardage of fill removed by plaintiff from the borrow areas.

In rationalizing the problem it is an acceptable starting premise that the plaintiff had more opportunity for control of fill above than below the line of mean low water, for once the fill was placed under the water physical forces beyond the plaintiff's control dictated the eventual shape to be assumed by the fill, provided it was evenly and properly deposited at the point of entrance. We shall confine the present discussion momentarily to those areas of the levee in which the plaintiff employed the floating line technique, which temporarily eliminates from consideration the first mile of levee up to station 51.

The plaintiff used the floating line to deposit hydraulic fill up to the approximate level of —5' MLW in order to form a firm base and counter the mud wave problem previously described. In operation the floating line deposited fill evenly across a width of 300', extending 150' on either side of the center line of the levee at the water line. Assuming this was done properly the fill thus deposited within a 300' width at the water line was supposed automatically to assume the slope angles required by the design, so that at a depth of —11 MLW it was to form a base approximately 800' wide straddling the center line evenly. The profiles in Government Exhibits 4 and 6 indicate that this did not happen. Instead, in the majority of locations reflected in the available record at depths of from approximately —4' to —10' MLW the fill fell substantially below the design slopes, and from there to the bottom it spread out far beyond the toes (i. e., where the design slopes intersected the bottom) of the levee on either side. The plaintiff was paid for fill which came to rest beyond the toes, but was deducted for the fill which came to rest above the paylines within the toes. Very likely the deposition of fill by the floating line caused more of it to disperse in the water and float in suspension to distant locations than when the fill was deposited by conventional lines in a more concentrated manner.

After the levee foundation was installed section by section up to a level of about —5' MLW with a floating line, the plaintiff built up the remainder of the levee to contract elevations with conventional shore lines whose operation has been described. The shore lines did not have the easy mobility or cover as wide an area as the floating lines. The plaintiff says they were shifted every 15 or 20 minutes with bulldozers or cranes in order to deposit the hydraulic fill as evenly as possible. They could not be moved beyond a 69' distance from side to side because that was the maximum width of the exposed part of the levee at normal high water. If the fill was spread evenly

over this width into the water it was supposed to slide into the water on top of the previously prepared foundation, and if it did not do so there was little that the plaintiff could do to make it assume the required underwater slope, so far as the record discloses. Heavy fill tended to accumulate above the paylines instead of drifting down. Light fill tended to disperse in the water and be carried considerable distances beyond the paylines by tides and currents.

The behavior of hydraulic fill placed in tidal waters is highly unpredictable and beyond human control because of the interaction of such factors as the conglomerate nature of the fill, method of placement, variations in the bottom material, waywardness of tidal currents, and impact of storms, to name the chief agents. The failure of the fill to assume the required shape was substantially beyond control of the plaintiff, but the plaintiff subscribed to the harsh provision of Specification TP1–04a (4), which makes the contractor responsible for excess fill deposited above the paylines "whether it is the result of wash due to normal pumping operations, mud waves which are beyond the control of the Contractor or any other causes whatsoever with the exception of submarine sand bars." No error is found in the Board's conclusions.

7. The plaintiff next assigns error to the Board's attempt to account for the underrun in ways which were not supported by substantial evidence. In briefing this point the plaintiff makes confusing transfers of reference from underruns to overruns, both of which have been discussed at some length under points 5 and 6 of this opinion. Thus the error in the Board's conclusion that the deduction experience in the first 26 stations of the levee built in shallow water could be used as a basis for a normal deduction rate throughout the levee, has been exposed, but without help to the plaintiff's right to recover. Also, the Board's pseudoscientific formula demonstrating the precise effect of eight storms and hurricanes in causing excessive deduc-

tions has been discounted, without destroying the major premise that storms were the principal cause of excess deductions, again with no benefit to plaintiff's claim. Basically the plaintiff is rearguing its contentions, already disposed of elsewhere, that the fill and the bottom conditions at the levee site were misrepresented. But they were not, as we have seen.

8. Finally the plaintiff says that the Board erred in rejecting expert opinion testimony explaining how the distribution of fill material so far beyond the payment lines demonstrated changed conditions respecting the composition of the borrow areas. The particular passage from the Board's decision is as follows:

> The evidence does not purport to show wherein the borrow material, the estuary bottoms of Hampton Roads, or any other phase or feature of the work differed materially from the representations on the drawings, the indications of the contracts or the circumstances normally to be expected in the construction of a levee in open tidal waters, within the changed conditions definitions of General Provision 4 of the contract, except for opinion testimony amounting to ultimate conclusions. Such testimony constitutes little more than an oral repetition of the allegations made in writing, and is fatally inadequate to sustain the burden of proving the allegations of fact forming the issues of the appeal.

Plaintiff's expert witnesses testified that plaintiff's methods of building the levee were proper, that hydraulic fill cannot be controlled once it is in the water, that it assumed its natural hydraulic shape in the water subject to storms and wave action, and that the soft fill material traveled beyond the pay areas because of its own consistency. This testimony is harmonious with the facts of the case but does not establish any changed condition whose risk the plaintiff did not assume in the contract. As least it does not go to prove that either the borrow or the bottom were misrepresented, although it infers that perhaps the Government de-

**634**

sign for the levee was not capable of being met. What the Board obviously meant in the paragraph quoted from its decision is that the conclusions voiced by plaintiff's expert witnesses did not persuade the existence of changed conditions entitling plaintiff to a recovery, not that they could not be entertained. We do not always agree with advice given by expert witnesses, and in that sense we "reject" it as the Board did, not because it is inadmissible but because it is not convincing. The Board was not convinced by the plaintiff's experts.

 A brief comment is appropriate concerning the effect of the Changed Conditions clause of the contract, which is of the later variety containing two situations deemed to constitute changed conditions, the second being "unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized, as inhering in work of the character provided for in this contract." The decisions of this court and the ASBCA bearing on this clause are usefully collated, in Sections 29.80 and 29.90 of Government Contracts, Vol. 4, McBride & Wachtel. Assuming the correctness of the finding that storms and hurricanes were chiefly responsible for the excessive deductions which increased the plaintiff's costs, indisputably such acts of God are not considered to constitute changed conditions. Arundel Corp. v. United States, 96 Ct.Cl. 77 (1942); Arundel Corp. v. United States, 103 Ct.Cl. 688, cert denied 326 U.S. 752, 66 S.Ct. 90, 90 L.Ed. 451 (1945); Breymann v. United States, 65 F.Supp. 398, 106 Ct.Cl. 367 (1946); Warren Bros. Roads Co. v. United States, 105 F.Supp. 826, 123 Ct.Cl. 48 (1952). To the extent that the effect of these holdings may have been diluted by John A. Johnson Contracting Corp. v. United States, 132 F.Supp. 698, 132 Ct.Cl. 645 (1955), it is believed that the provisions of the contract in suit whereunder the plaintiff voluntarily assumed the cost of excessive deductions *from any causes whatsoever,* which would include storms differentiate the present claim from any

exception to the general rule. Because of these same provisions the plaintiff can derive no help from the type of argument successfully employed in Paccon, Inc., ASBCA 7643, 62 BCA 3546 (1962), where the unpredicted behavior of clay known to be present in the area of the worksite was found to constitute a changed condition justifying an equitable adjustment for excessive costs.

Under all the circumstances it is quite clear that the decision of the Board was neither arbitrary nor capricious, and that in major part it was supported by substantial evidence. The minor disagreements explained herein do not affect the result.

### CONCLUSION OF LAW

Upon the foregoing opinion of the commissioner reciting the controlling facts of the case, which opinion as revised herein, and facts are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and the petition is dismissed.