**FRU–CON CONSTRUCTION CORPORATION,**
Plaintiff,

v.

The **UNITED STATES,** Defendant.

No. 97–43C.

United States Court of Federal Claims.

July 16, 1999.

Val S. McWhorter, Vienna, VA, for plaintiff. Mark E. Hanson and Claire E. Kresse, Smith, Pachter, McWhorter & D'Ambrosio, P.L.C., of counsel.

Sean C. Griffin, Washington, DC, with whom was Acting Assistant Attorney General David W. Ogden, for defendant. Rian Hancks, Rock Island District Army Corps of Engineers, Rock Island, IL, of counsel.

## OPINION

MILLER, Judge.

On March 31, 1999, an opinion issued finding and concluding that Fru–Con Construction Corp. ("plaintiff") failed to prove its case by a preponderance of the evidence and entering judgment for defendant. *See Fru-Con Const. Corp. v. United States*, 43 Fed.Cl. 306 (1999). Thereafter, on April 14, 1999, plaintiff moved for reconsideration pursuant to RCFC 59(a), (d), contending that the court should "alter and amend manifest errors of fact and law." Plf's Br. filed Apr. 14, 1999, at 2. Plaintiff's motion presents six issues for reconsideration: (1) whether the court failed to consider plaintiff's claim for the unpaid contract balance; (2) whether the court failed to consider plaintiff's claim for increased costs resulting from added silt removal; (3) whether plaintiff submitted sufficient evidence from which the court could apportion damages between overbreak and weather; (4) whether plaintiff submitted evidence linking productivity losses to temperature and humidity experienced on the project; (5) whether the court's legal and factual conclusions regarding plaintiff's claims for Type I and Type II were inaccurate, "contrary to precedent," *id.* at 3, and unsupported by the evidence presented; and (6) whether the court's conclusions regarding notice and plaintiff's demonstration of an excusable delay for extreme heat and humidity were mistaken. The leitmotif of defendant's response is that plaintiff can satisfy none of the criteria to warrant relief on reconsideration: "[Plaintiff] spends most of its motion contesting the Court's factual findings and legal conclusions—exactly the type of arguments against which this Court warned [in two of its prior cases]." Def's Br. filed May 14, 1999, at 23.

## FACTS

Pertinent facts discussed in the court's prior opinions will not be repeated. *See Fru–Con Const.*, 43 Fed.Cl. 306; *Fru–Con Const. Corp. v. United States*, 42 Fed.Cl. 94 (1998). Explication of additional facts, necessitated by the parties' contentions, will be incorporated into the court's discussion.

## DISCUSSION

1. *Standard of review*

RCFC 59(a) provides, in pertinent part:

A new trial or rehearing or reconsideration may be granted to all or any of the parties and on all or part of the issues, for any of the reasons established by the rules of common law or equity applicable as between private parties in the courts of the United States. On a motion under this rule, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

*See* RCFC 59(d). "When addressing such a motion, the court is directed 'to consider motions for rehearing [or reconsideration] with exceptional care.'" *Seldovia Native Ass'n Inc. v. United States*, 36 Fed.Cl. 593, 594 (1996) (quoting *Carter v. United States*, 207 Ct.Cl. 316, 318, 518 F.2d 1199, 1199 (1975)), *aff'd*, 144 F.3d 769 (1998). "[M]otions for reconsideration should not be entertained upon 'the sole ground that one side or the other is dissatisfied with the conclusions reached by the court, otherwise the losing party would generally, if not always, try his case a second time, and litigation would be unnecessarily prolonged.'" *Seldovia Native*, 36 Fed.Cl. at 594 (quoting *Roche v. District of Columbia*, 18 Ct.Cl. 289, 290, 1800 WL 1263 (1883)).

A motion for reconsideration is addressed to the court's discretion. *See Seldovia Native*, 36 Fed.Cl. at 594; *see also Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577, 1583 (Fed.Cir.1990). A party must support the motion by a showing of extraordinary circumstances which justify relief. *See Bally Export Corp. v. Balicar, Ltd.*, 804 F.2d 398, 400 (7th Cir.1986). This showing, under RCFC 59, must be based "upon manifest error of law, or mistake of fact, and is not intended to give an unhappy litigant an additional chance to sway the court." *Bishop v. United States*, 26 Cl.Ct. 281, 286 (1992) (internal quotation omitted); *see Cohen v. Austin*, 869 F.Supp. 320, 321–22 (E.D.Pa. 1994) (discussing contested errors in law and

fact). The movant may not merely recapitulate "cases and arguments considered by th[e] court before rendering its original decision." *Carteret Savings Bank, F.A. v. Shushan,* 721 F.Supp. 705, 706 (D.N.J.1989); *see Gelco Builders & Burjay Const. Corp. v. United States,* 177 Ct.Cl. 1025, 1036–37 n. 7, 369 F.2d 992, 1000 n. 7 (1966) ("Litigants should not, on a motion for reconsideration, be permitted to attempt an extensive re-trial based on evidence which was manifestly available at the time of the hearing."); *see also Bhatnagar v. Surrendra Overseas Ltd.,* 52 F.3d 1220, 1231 (3d Cir.1995) ("Whatever other circumstances may justify reconsideration, mere presentation of arguments or evidence *seriatim* does not."); *Van Skiver v. United States,* 952 F.2d 1241, 1243 (10th Cir.1991) (revisiting previous issues is not purpose of motion to reconsider); *National Metal Finishing Co., Inc. v. BarclaysAmerican/Commercial, Inc.,* 899 F.2d 119, 123 (1st Cir.1990) (losing party cannot simply rehash original arguments). Put simply, the rulings of a court are not "mere first drafts, subject to revision and reconsideration at a litigant's pleasure." *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.,* 123 F.R.D. 282, 288 (N.D.Ill.1988).

▪ To sustain its burden, the movant must show: (1) that an intervening change in the controlling law has occurred; (2) that previously unavailable evidence is now available; or (3) that the motion is necessary to prevent manifest injustice. *See Bishop,* 26 Cl.Ct. at 286; *see also Aerolease Long Beach v. United States,* 31 Fed.Cl. 342, 376 (quoting *Bishop,* 26 Cl.Ct. at 285–86), *aff'd,* 39 F.3d 1198 (1994) (Table). Because " '[t]he litigation process rests on the assumption that both parties present their case once, to their best advantage,' " a strong public policy precludes a reconsideration motion based on evidence that was readily available at the time the original motion was heard. *Aerolease,* 31 Fed.Cl. at 376 (quoting *Bishop,* 26 Cl.Ct. at 286); *see General Elec. Co. v. United States,* 189 Ct.Cl. 116, 117–18, 416 F.2d 1320, 1321–22 (1969) (per curiam) (finding that where party had notice of potential issue, chance to present its position, failed to do so, and does not give sufficient excuse, "post-decision relief" will be denied); *Mega Const. Co., Inc. v.*

*United States,* 29 Fed.Cl. 396, 404–05 (1993) (adopting *Bishop* standard for reconsideration motions).

### 2. *Unpaid contract balance*

According to plaintiff, the Army Corps of Engineers (the "Corps") retained a contract balance in the amount of $60,000.00. Plaintiff also maintains that the Corps understated the contract amount by $59,073.00, which was addressed in a contract modification, presented by plaintiff and approved by the Corps, for miscellaneous metal items during the course of performance. Although payment for this modification was received, the Corps later deducted this amount from the contract. Plaintiff seeks an equitable adjustment on this issue in the amount of $119,073.00 plus interest. Moreover, plaintiff contends that it has never received the $82,780.00 in liquidated damages, which the contracting officer's July 1, 1996 decision found to be due plaintiff as a result of the four-day strike at the Brandon Road Lock.

Defendant counters that plaintiff's claim for liquidated damages was "by necessity considered and rejected" in light of the court's determination with regard to plaintiff's heat claim. Def's Br. filed May 14, 1999, at 36. In this regard, defendant notes that plaintiff previously has received payment for accelerating over the costs of the Brandon Road strike. Defendant also argues that the $59,073.00 in miscellaneous metals represents a portion of the cost incurred to repair the damage from the overbreak and that the court's rejection of plaintiff's claim for overbreak "also repudiated [plaintiff's] claim for this $59,073.00." *Id.* Although pointing out that plaintiff did not seek the unpaid contract balance in either its original or amended complaint, defendant states that "the Corps has notified the Department of Justice that is has begun procedures to pay the contract retainage, which amounts to approximately $60,000.00. The Corps expects that [plaintiff] will receive this money by June 1, 1999." *Id.* at 36–37.

Defendant is correct that plaintiff's claim for the unpaid contract balance was not included in either its original or amended com-

plaint. Nonetheless, plaintiff listed this claim in Plaintiff's Statement of Issues of Fact and Law, as follows: "Whether completion of the Project entitles [plaintiff] to payment from the Corps of its unpaid contract balance (retention), plus Prompt Payment Act interest." Plf's Statement of Issues of Fact and Law No. 95, filed Nov. 10, 1998. The issue, therefore, was properly before the court. Defendant did not dispute that this amount was due plaintiff at trial. The contracting officer's October 31, 1996 final decision states that the Corps was holding "$184,170 in retention, $124,170 of which are liquidated damages held under Special Clause 2 and which were essentially the subject of my July 1, 1996 decision and $60,000 of which are retainage held under Contract Clause 61(e) pending contractor completion of remaining work." Having completed the project, plaintiff is entitled to the $60,000.00 retained by the Corps.

With regard to liquidated damages, the contracting officer's July 1, 1996 final decision concluded that plaintiff had demonstrated a valid acceleration claim resulting from the Teamsters strike at Brandon Road. The contracting officer's decision recited:

> While the contractor has a valid claim for its strike-related acceleration costs, this amount must be offset by the amount of previously-remitted liquidated damages. As noted above, on March 7, 1996, the Government remitted 4 days of the previous 10 days of assessed liquidated damages in consideration of the Brandon Road strike delay. Subsequent review of the contractor's own schedules, records and claim, however, has shown that the contractor actually successfully accelerated over the strike delay and its 10–day late finish was thus not attributable to this delay. Accordingly, reducing the contractor's incurred acceleration costs of $109,573.63 by the $82,780.00 in already-remitted liquidated damages results in a total compensable acceleration cost to overcome the Brandon Road strike delay of $26,793.63.

(Citations omitted.) While not contesting that plaintiff is entitled to $82,780.00 for overcoming the strike delay, defendant challenges what it considers as plaintiff's attempts to be paid twice for this delay. Defendant is incorrect that the court's denial of plaintiff's heat claim by necessity denied plaintiff's claim to damages surrounding the acceleration effort over the Brandon Road strike. Although the contracting officer's decision indicates that this amount was remitted, plaintiff disagrees. Plaintiff is entitled to one payment of $82,780.00 or one deduction of the same amount from sums owed to the Corps in liquidated damages assessed for late completion of the project. If the Corps has remitted this amount to plaintiff or properly deducted it, plaintiff is not entitled to recover it again.[1]

■ Plaintiff's claim for $59,073.00 in miscellaneous metal items stems from the payment of metal items at unit prices that the Corps deducted subsequently from a later payment submission. Plaintiff submitted Payment Estimate No. 13, which indicates that the Corps deducted $2,501.20, $15,201.90, and $41,370.00 for roller guides and miscellaneous metals. No specific explanation for these deletions was provided at trial. In opposition to plaintiff's motion, defendant asserts that "the $59,073 that [plaintiff] seeks for miscellaneous metals represents the amount that [plaintiff] had to pay to repair its overblast. Therefore, the Court's rejection of the overblast issue also repudiated [plaintiff's] claim for this $59,073." Def's Br. filed May 14, 1999, at 36. Although defendant neglected to direct the court's attention to evidence in support of its position, the record reveals that the additional costs for roller guides and miscellaneous metals were incurred for construction of the floating mooring bitts ("FMBs"). Plaintiff's July 3, 1996 claim letter discusses the additional costs incurred as a result of the overbreak and the modifications, *inter alia*, to the rebar dowels and roller guide support. Both par-

---

1. Defendant is correct that the court's denial of plaintiff's claims for heat delays, overblasting, and excusable delay results in a denial of plaintiff's claim regarding the $206,950.00 assessed in liquidated damages for the 10 days during which the locks remained closed after the September 8, 1995 deadline.

ties' witnesses discussed the extensive repair and customized rebar, anchor, and roller guide work that the overblast damage required. Insofar as plaintiff failed to meet its burden for a Type I or Type II differing site condition and did not provide notice, the court has determined that plaintiff is responsible for such costs. Plaintiff has not demonstrated that the miscellaneous metals were attributable to anything other than the overbreak, and plaintiff may not recover for repair or the cost of materials resulting from the overblast damage.

### 3. *Silt removal*

██ Plaintiff contends that it is entitled to an equitable adjustment for additional silt removal. Plaintiff's damages expert quantified the cost of such removal in the amount of $286,577.00. According to plaintiff, contemporaneous surveys of the cross-section results indicated the presence of increased quantities of silt, which defendant rebutted only with post-performance visual estimates by Dennis M. Ziemba, a Construction Inspector contracted by the Corps, *inter alia,* for claim evaluation. Defendant rejoins that Mr. Ziemba performed his own calculations based on photographs and contract drawings. Explaining that disruption of the silt "improperly increas[ed] the quantity," Def's Br. filed May 14, 1999, at 22, defendant emphasizes that the contract "prohibited . . . surveying of silt after it had been moved, and . . . warned . . . that the Corps would not pay for silt based upon [such surveys]," *Id.* at 21.

Clause C–02140–2 of the contract, entitled REMOVAL OF MATERIAL FROM LOCK CHAMBER FLOOR, provides, in part:

> All silt, loose rock, and debris shall be removed from each lock chamber floor from the upstream closure (bulkhead) to the downstream closure (bulkhead) during the dewatered period. . . . A cross-section survey for silt and rock shall be made prior to and after removal operations to establish the quantity for payment. Debris shall be considered a subsidiary obligation to the removal of silt and rock and shall not be included in the measurement for payment items listed in paragraph C–02140–11.2 [sic] entitled, "Removal of Silt

and Loose Rock." Concrete and other debris removed during the demolition operations will not be included in the measurement for payment items listed in paragraph C–02140–11.2 [sic] entitled, "Removal of Silt and Loose Rock."

Paragraph 10.2, entitled Removal of Silt and Loose Rock, recites:

> Payment for the removal of silt and loose rock in each lock will be made at the contract unit price per cubic yard for the following items:
>
> | Item No. 0006 | Brandon Road Lock—Removal of Silt and Loose Rock from Lock Chamber |
> | --- | --- |
> | Item No. 0034 | Dresden Island Lock—Removal of Silt and Loose Rock from Lock Chamber |
> | Item No. 0064 | Marseilles Lock—Removal of Silt and Loose Rock from Lock Chamber |

The contracting officer's October 31, 1996 decision denied plaintiff's request for an equitable adjustment in this regard, finding that "subsequent analysis has revealed that the contractor improperly included in its pay quantities removed concrete and steel debris. The actual amount of silt and rock removed was much smaller than alleged in the claim." Thus, the Government adjusted plaintiff's later pay estimates. The decision noted: "The bottom of the lock chambers should have been surveyed immediately after dewatering, and then again immediately after the removal of silt and loose rock, to allow a true measurement of the volume of such material removed." Plaintiff, however, waited until after blasting of the concrete to conduct a survey of the bottom of the lock chamber following dewatering. The decision further explicated:

> By this time, the removed concrete had been mixed into the silt and loose rock present on the bottom of the lock chamber and all this combined material had been heaped into piles. The contractor's submitted quantities for silt/rock removal thus included significant amounts of removed concrete and debris which were not to be

paid for under these line items. This gathering of the material into piles prior to surveying was also contrary to the common construction, surveying and engineering practice of surveying material to be removed in its in-place, undisturbed state. Disturbing material to be measured for volume by moving it, heaping it into piles, etc., increases the volume of the material (also called swell).

170. Review of the contractor's bid papers indicates that its handling of the silt/rock surveys and payment quantities is perhaps not surprising. The contractor generally did not include a cost for disposal in small volume concrete removal items .... The contractor also planned on, and carried out, disposal of all removed concrete by letting it fall into the lock chamber and having it removed from there. While the contractor did generally include a cost for disposal in the larger concrete removal line items, by also including this concrete in the amount of material paid for under the silt/rock removal line items, it received a double payment for this concrete disposal.

171. When the improperly-included actual concrete removal quantities (calculated by adding the pay estimate quantities for quoin block concrete removal, miter gate anchorage modifications-concrete removal, miter gate sill modifications-concrete removal, and miter gate recess modifications-concrete removal, to the Area Office's calculation of concrete removed under lump-sum items for miter gate recess modifications-diagonal stressing anchors and new floating mooring bitts-concrete removal), are deducted from the total pay quantities submitted by the contractor for line Items Nos. 0006, 0034 and 0064, the new quantities for silt/rock removal are much lower (i.e., 267 CY, 90 CY, and 3 CY respectively). Allowing the contractor the full 97 CY agreed to in a field agreement sheet for "Removal of Silt and Rocks from Lock Floor. Pay Item Quantities," for Dresden Island, and even 200 CY for Marseilles (based upon its having spent 2 shifts removing material eligible for payment and its bid papers' estimated production rate per shift), it is clear that, contrary to the contractor's claim, there was no quantity overrun at Dresden Island and much smaller ones than alleged at Brandon Road and Marseilles.

(Citations omitted.)

Mr. Ziemba indicated that the foregoing paragraphs were the direct result of his analysis of plaintiff's claim for added silt removal. Mr. Ziemba arrived at his conclusions after analyzing plaintiff's quantities, available documentation—including quality assurance reports ("QARs"), Corps drawings indicating the dimensions of the locks, inspectors' diaries, and dated photographs taken immediately after the locks were dewatered, as well as discussions with on-site inspectors. Mr. Ziemba concluded that 225 cubic yards of silt and loose rock were present at the Brandon Road lock, rather than the 100 cubic yards initially estimated. Mr. Ziemba based his review on the photographs, which he "relat[ed] ... to known dimensions and elevations," and relied on "conversations with people who were actually at the site and had intimate knowledge of it in that they were down there and walking around during the course of the work." Regarding Dresden Island, Mr. Ziemba calculated 100 cubic yards of silt and loose rock, in contrast with plaintiff's estimate of 278 cubic yards. Plaintiff submitted a claim for approximately 390 cubic yards of silt and loose stone removed from the Marseilles lock. Mr. Ziemba opined, however, that the Marseilles lock was "relatively clean" and attributed 200 cubic yards of material to silt and loose rock removal.

Mr. Ziemba noted that the amounts submitted by plaintiff would require that the entire floor of the lock chamber be covered with silt and loose rock; the pictures indicated plainly that the silt and loose rock were localized. It was Mr. Ziemba's understanding that plaintiff's surveys of the silt and loose rock were completed after the materials were moved and included concrete debris from the blasting operations. This was of concern, not only because the addition of concrete would add to the volume, but also because the movement of the materials would result in an increased volume or swell, such

that it was not truly representative of the amount removed.

The following exchange occurred during cross-examination of Mr. Ziemba:

Q Now, in this analysis you are not demonstrating the amount of silt that was actually removed from the locks, are you?

A What I was doing with that analysis is establishing how much concrete was dropped into the bottom of the lock chamber and how that related to the total quantity that had been submitted for payment for silt and loose rock removal.

Q You are not providing the Court any actual measurements of silt. Is that right?

A With what I had available, I would not be able to provide actual physical measurements.

Q You are estimating the amount of silt from these pictures by eye? Is that right?

A Looking at the photograph and also looking at the plan sheets that show, for example, typical sections through the lock to get the measurements and elevations of various features.

Q Which is more accurate, referring to photos and drawings or actual cross section surveys?

A I think one has to take everything into consideration. The surveys are not valid in that they include broken concrete from the demolition.

Q You observed that measurement being taken?

A I was not there, sir. I did not observe it.

Q So how do you know that they included broken concrete?

A From photographs, as well as QARs, as well as talking to the gentlemen who were the on site inspectors.

Q So you are relying on information from other sources?

A Yes, sir. Reliable information from someone on the job at the time the work was being done.

Q You are not aware of any evidence that actually states [plaintiff] only removed 200 cubic yards from Brandon Road, are you?

A Pardon me? Could you repeat that?

Q I said you are not aware of any documentary evidence that [plaintiff] only removed [225] cubic yards of silt from Brandon Road, are you?

A I have what I've—the information I have is what I have produced through review of all the materials and the subsequent analysis.

The testimony of James J. Cipollone, plaintiff's Project Manager, revealed that plaintiff bid 100 cubic yards as the amount of silt, loose rock, and miscellaneous debris estimated to be located at the bottom of each lock. According to Mr. Cipollone, plaintiff intended to push the materials into a pile with a small loader, load them into a skip pan, and remove it with a cherry-picker straight into the trucks. However, the increased quantities, e.g., over 800 cubic yards at Brandon Road, prohibited this method of removal. Mr. Cipollone described the process in which the materials were piled on the lock floor, removed with the use of a skip pan and crane, piled on top of the lock, and later loaded into trucks which would dispose of the materials off site. Mr. Cipollone noted the inefficiency of this method and the unavailability of another method of removal. Mr. Cipollone conveyed that the Corps originally paid for these quantities, but later deducted the amounts that plaintiff now claims. Although acknowledging that "[c]oncrete rubble was spread all over the place," Mr. Cipollone maintained that the survey was conducted without including the concrete in the calculations. Indeed, Mr. Cipollone expressed amazement that the 800 cubic yards claimed for Brandon Road was reduced to 267 cubic yards by the Corps, and contended that the Corps, in essence, paid only for removal of debris at the Dresden Island Lock.

The testimony reveals that accurate surveys were not conducted. Plaintiff's surveys included some concrete removal, given that the blasting operation took place before plaintiff removed the silt, loose rock, and debris from the chamber, and were conducted after the materials were piled two separate times—once on the lock floor and once on the top of the lock. In the course of this transportation and during the time the materials were piled, other materials were mixed

with the silt and loose rock, and that the phenomenon described as "swell" occurred, increasing the volume of materials removed. In spite of the lack of physical measurements, the photographs and Mr. Ziemba's persuasive testimony cast significant doubt on the methods employed by plaintiff both in measuring and removing the silt, loose rock, and miscellaneous debris from the lock chamber. Mr. Cipollone's acknowledgment of the presence of some blasting debris, for which he unconvincingly testified that plaintiff accounted, reinforces this conclusion. Consequently, having failed to demonstrate increased silt quantities by a preponderance of the evidence, plaintiff is not entitled to recover on this claim.

### 4. *Apportionment of damages*

Plaintiff posits that the court erred in finding that its damages expert, Scott D. Gray, did not segregate his damage analysis to reflect which costs resulted from weather delays and from overbreak. Plaintiff asserts: "Mr. Gray testified in deposition and at trial that the portion of damages attributable to weather were delay damages calculated by applying the daily delay rate by the number of days of delay related to weather and the number of days related to overbreak." Plf's Br. filed Apr. 14, 1999, at 6. Reading this testimony in conjunction with the testimony of Robert J. Schlunt, plaintiff's scheduling expert, who, according to plaintiff, allocated a finite number of days of delay due to heat, the court was able to ascertain a measure of damages, because "the number of delay days ... multiplied by the daily rate, yields a certain apportionment of a part of the costs [plaintiff] incurred due to extreme heat and humidity...." *Id.* at 7. Defendant responds that plaintiff never attempted to segregate its damages until the court remarked on the conspicuous absence of this evidence. Defendant maintains that the court properly excluded Mr. Gray's supplemental analysis prepared during trial, that Mr. Gray did not provide the court with a figure for either the overblasting claim or the heat delay claim, and that removing inefficiencies from the

claims "'would entail quite a bit of work at the board.'" Def's Br. filed May 14, 1999, at 20.

Mr. Schlunt concluded that plaintiff experienced a net of 9 days of delay to the project and 34 days of real delay from both weather and acceleration, which included overbreak repair work and a number of interacting factors. Although Mr. Gray testified to a figure for "average daily rate, time-related project overhead" equal to $8,542.00 and a daily rate of equipment cost equal to $6,519.00, he did not allocate amounts resulting exclusively from overbreak or weather delays.[2] Mr. Gray's belated analysis segregating the cost of overbreak from costs incurred due to delays in weather was not admitted into evidence because of the prejudice to defendant, which had not received this information prior to trial despite having asked about it during Mr. Gray's deposition. The court therefore had before it no basis from which to determine a proper measure of damages for each claim. Plaintiff assumed that the separation of costs was unnecessary, as evidenced by its attempt to provide such information only after the court noted its absence. Defendant should not be prejudiced due to this lack of foresight, and Mr. Gray's alternative analysis, prepared during the course of trial, was excluded. Because plaintiff was unable to satisfy its burden of proof, particularly in light of the lack of contemporaneous notice or written evidence in support of its claims, this question regarding damages is peripheral.

### 5. *Interaction of heat and other inefficiencies in damages calculation*

Plaintiff argues that Dr. James J. Adrian's analysis established that "temperature and humidity ... results in quantifiable productivity loses." Plf's Br. filed Apr. 14, 1999, at 7. The court "inexplicably [held] that [plaintiff] cannot demonstrate delay due to lost productivity caused by high temperatures." *Id.* (footnote omitted).

---

2. Mr. Gray multiplied each figure by 10 days of delay for the late completion of Brandon Road, as well as by a percentage for markups representing overhead and profit. This calculation resulted in a total of $100,691.00 for project overhead and $76,843.00 for equipment costs.

Dr. Adrian's analysis, in fact, delineated damages due to heat and humidity, as opposed to other possible causes. Dr. Adrian quantified the impact of the extreme heat and humidity on labor working on the Illinois Waterway locks in terms of the hours lost due to the actual temperatures and humidity experienced at the locks, and provided that quantification in his testimony to the Court.

*Id.* at 8 (citations omitted).

Defendant responds that Dr. Adrian's analysis was insufficient to bridge the evidentiary gap regarding the impact of heat and humidity. Contending that the plain language of section H, Special Contract Requirements, clause 53(c) requires that work be prevented on 50% of critical path activities, defendant points out that plaintiff indicated merely that its progress was slowed, rather than prevented. Defendant also faults Dr. Adrian for not attributing a specific amount for weather in his analysis, and notes that the actual percentage ascribed to plaintiff's loss of productivity was 7%, thereby falling far below the required 50% contract threshold.

Dr. Adrian opined that high temperatures typically result in quantifiable productivity losses of 10–30%. In his preliminary calculation, Dr. Adrian multiplied this factor of 30% by the number of hours incurred on the project. This calculation convinced him to proceed with further analysis. As noted in the court's March 31, 1999 opinion, Dr. Adrian's analysis accounted for lost productivity hours regarding temperature, overtime, overcrowding, and the difficulty of the work due to overbreak. Although concluding that the delta between the number of lost hours plaintiff was claiming and those he calculated was sufficient to account for inefficiencies and other factors, irrespective of which party was responsible, Dr. Adrian did not provide a measure of loss attributable solely to weather, but, rather, suggested that such loss was represented by the temperature calculations and nonspecific portions of the overtime and crew size calculations. In addition to successfully rebutting plaintiff's evidence through cross-examination, defendant correctly notes that Dr. Adrian calculated a loss of approximately 7% due to heat, which,

when combined with additional factors, rose to approximately 13%. While Dr. Adrian's calculations suggest some loss of productivity, both figures fall far below the 50% required by section H, Special Contract Requirements, clause 53(c). Thus, Dr. Adrian's testimony does not account for evidentiary deficiencies revealed at trial, given plaintiff's inexcusable lack of recordation regarding the impact of the weather.

### 6. *Differing site conditions*

#### 1. *Type I differing site conditions*

Plaintiff construes the court's opinion regarding its review of documents and other materials referenced in the contract as having failed to consider the information revealed therein. In other words, plaintiff contends that the court held that the contractor may not recover if it failed to review pertinent documentation, irrespective of whether that documentation provides information relevant to the existence of a differing site condition. Plaintiff asserts:

The record, however, is wholly lacking in foundation for the de facto presumption the Court in effect grants to the Government in this instance that the mere failure to review these records, regardless of their contents, establishes the unreasonableness of the contractor's anticipation of conditions. . . . There simply is no evidence on the record before this Court that any information contained in the materials the Court so vigorously chastises [plaintiff] and [Ludwig Explosives, Inc. ("Ludwig")] for not reviewing would have affected their expectations of the conditions of the lockwall concrete. . . . The Court's Opinion reaches the conclusion of law upon which [plaintiff] seeks reconsideration without a shred of evidentiary support that review of such information, or specific data contained therein, would have or should have altered [plaintiff's] and Ludwig's expectations that the concrete was uniform, homogenous, sound, monolithic concrete.

Plf's Br. filed Apr. 14, 1999, at 9–10. Plaintiff also challenges the court's conclusion that defendant met its burden by demonstrating that plaintiff performed inefficiently or unreasonably.

Defendant argues that plaintiff failed to show that the contract misrepresented the conditions and therefore was not able to demonstrate a Type I differing site condition:[3] (1) Plaintiff "admitted that the contract contained no specific indications of the concrete's condition"; (2) plaintiff "could not explain exactly how the concrete differed from the contractual representations"; and (3) "the evidence showed that [plaintiff] could not have relied upon any alleged misrepresentations." Def's Br. filed May 14, 1999, at 25. In light of plaintiff's admissions, defendant maintains that no basis exists for the court to reconsider its decision. Defendant also renews its motion to dismiss plaintiff's differing site conditions claim for lack of subject matter jurisdiction because plaintiff's claim before the contracting officer explicitly denied the existence of contractual indications regarding the concrete.

■ Failure to review contract documentation alone does not warrant the denial of a claim. Indeed, if the unreviewed contract documentation contains no relevant information regarding the condition of the concrete, whether the contractor consulted such documentation is not determinative. *See Troup Bros. Inc.*, 72–2 BCA ¶ 9,491, at 44,221–22 (noting "contractor runs a grave risk in failing to review all documents made available"; however otherwise valid claim not forfeited where failure to review would serve no useful purpose). Where the documentation contains pertinent information that bears on what the contractor should expect, the failure to review becomes significant. *See Dawco Const., Inc. v. U.S.*, 18 Cl.Ct. 682, 692 (1989), *aff'd in part, rev'd in part*, 930 F.2d 872 (Fed.Cir.1991) ("Contractors are also not required to inspect documents not a part of the contract[,] but are charged with information contained in data furnished as part of the contract and available to bidders."). In this instance plaintiff did not review the documentation concerning conditions of the concrete that were included and referenced within the contract. This documentation indicated, *inter alia*, the composition and compressive strengths of the concrete, original and rehabilitation plans, and the existence of electrical utilities. This information was relevant to blasting, as well as to the conditions that the contractor should have expected and, in fact, did encounter.

■ Although declining to credit one expert's testimony as more persuasive than the other regarding the cause of the overblast, the testimony of defendant's John M. Loizeaux indicated that the contract documents depicted the existence of joints, rebar, aggregate, wall armor, utilities, mechanical breaks, and a weathered fracture. Mr. Loizeaux admitted on cross-examination that the location of all joints was not revealed, yet he emphasized that the existence of these joints was revealed within the contract documents and that the contractor was to take actual measurements on site. In response to questioning by the court, Mr. Loizeaux stated that the concrete's reaction to blasting was the result of factors within the concrete; these factors were included in the contract documents, *e.g.*, aggregate. Considering the amount of explosives, spacing, and timing, Mr. Loizeaux opined that the concrete reacted "consistently with what [was done] to the material ... [which] really had no option but to do what it did do under those circumstances." It was also his opinion that a reasonable contractor would expect some of the joints to be open and some tightly pressure grouted because the remediation projects at the lock sites took place approxi-

3. Defendant makes the unassailable point "if the contract contained no specific information relating to the concrete's condition, as [plaintiff] alleged, [plaintiff] could not show the contractual misrepresentation necessary to demonstrate a Type I differing site condition." Def's Br. filed May 28, 1999, at 3; *see P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984) ("A contractor cannot be eligible for an equitable adjustment for changed conditions unless the contract indicated what those conditions would supposedly be."). The infor-

mation, however, need not be specific for plaintiff to recover. "[A]ll that is required is that there be enough of an indication on the face of the contract documents for a bidder reasonably not to expect subsurface or latent physical conditions at the site differing materially from those indicated in this contract." *Dawco Constr., Inc. v. United States*, 18 Cl.Ct. 682, 688 (1989) (internal quotations omitted), *aff'd in part, rev'd in part*, 930 F.2d 872 (Fed.Cir.1991); *see P.J. Maffei*, 732 F.2d at 916.

mately 10 to 20 years prior to the Illinois Waterway project. Plaintiff's expert, Dr. Calvin J. Konya, although maintaining that the concrete was homogeneous, agreed that the contract documents depicted the age of the concrete, as well as rebar dowels, remediation, construction joints, some coring information, aggregate, and air voids. Dr. Konya further noted that a concrete expert would know of potential weathering in construction joints and that the presence of construction joints may result in overbreak.

Similarly, along with the testimony regarding subsurface conditions discussed in the court's March 31, 1999 opinion, the testimony of Richard L. Allen, plaintiff's Chief Estimator, who conducted the pre-bid investigation, reveals that he was aware of remediation and joints in the concrete—joints that were later cited by plaintiff as partially responsible for the overbreak—and expected an indeterminate amount of overbreak from blasting. Plaintiff's expectations that the concrete would break differently did not account for all available information or the on-site observations of its chief estimator.[4] This, in conjunction with the statements from plaintiff's other witnesses that the subsurface conditions of the concrete were represented in the contract documents, undermines plaintiff's argument.

Although not expected to anticipate the worst-case scenario, plaintiff is responsible for evaluating the available information and reasonably extracting from such information subsurface conditions. The evidence at trial supports a finding that the subsurface conditions were reasonably foreseeable. The failure to consult all relevant documentation does not render plaintiff's interpretation of those documents reasonable. "Reasonable reliance will not be found where the contractor bid without having reviewed all of the contract indications." J. Cibinic, Jr. & R. Nash, Jr., *Administration of Government Contracts* 508 (3d ed.1995) (citations omitted); *see A.S. McGaughan Co. v. United States*, 24 Cl.Ct. 659, 665 (1991), *aff'd*, 980 F.2d 744 (Fed.Cir.1992) ("The contractor must show that it reasonably relied on the contract and contract-related documents. Moreover, '[t]he conditions actually encountered must have been reasonably unforeseeable based on all the information available to the contractor at the time of bidding.'") (citations omitted).[5] Plaintiff neglected to review all of the contract indications and knew, at least, of the presence of joints from a surface view of the locks. *See generally A.S. McGaughan*, 24 Cl.Ct. at 666 (holding plaintiff unable to prove differing site condition due to failure to review referenced soil test results).[6]

4. Plaintiff's initial expectations were also based upon the use of mechanical means of removal. Although the choice of another means of removal permitted by the contract pre-bid does not necessarily indicate a lack of reliance, *see Illinois Constr. Co.*, 91–2 BCA ¶ 23,728, at 118,846–47, plaintiff's chief estimator acknowledged that plaintiff's bid would have been significantly different if blasting were the original planned means of removal.

5. Plaintiff asserts that "the Court apparently misapprehended [its] position." Plf's Br. filed Apr. 14, 1999, at 12. According to plaintiff, its expectations were based on the documentation that it did review, as well as the site investigation, for the conclusion that the concrete would be sound, uniform, and monolithic. Although that information is also necessary to the contractor's understanding, it may not be used to the exclusion of other documentation available for the contractor's review, which provides relevant information regarding subsurface conditions. Plaintiff's position in this regard is particularly suspect in light of the fact that it based its initial review and inspection on mechanical means of removal,

rather than blasting. What is more, Mr. Allen indicated that he would have employed a blasting consultant during his site inspection had plaintiff planned initially to remove the concrete through blasting.

6. The parties dispute whether the contract must misrepresent subsurface conditions or mislead the contractor. A contractor may recover for a differing site condition when a subsurface condition is misrepresented or if the contractor is misled by the information within the contract. In addition to noting plaintiff's lack of reliance, the court compared this case to others, noting that this was not a situation in which the contractor was misled by a representation contained within the contract documents. Misrepresentation—a knowing or negligent false representation—is not a prerequisite to a successful claim. *See Foster Const. C.A. & Williams Bros. Co. v. United States*, 193 Ct.Cl. 587, 603, 435 F.2d 873, 881 (1970). "However, 'a contractor cannot call himself misled unless he has consulted the relevant Government information to which he is directed by the contract, specifications, and invitation to bid.' A misrepresentation claim is pre-

Moreover, plaintiff did not demonstrate that all costs associated with the claim for overblast damages were "solely attributable to the *differing subsurface conditions*." J. Cibinic Jr. & R. Nash, Jr., *supra*, at 511; *see Spirit Leveling Contractors v. United States*, 19 Cl.Ct. 84, 94 (1989) ("[T]he contractor must demonstrate that the excess costs are attributed entirely to the materially different subsurface conditions met at the site."). Indeed, "[c]oncurrent causes of excess cost, such as costs resulting from the contractor's own mistakes, must be carefully distinguished by the court." J. Cibinic, Jr. & R. Nash, Jr., *supra*, at 511. Plaintiff's failure of review was complicated, at a minimum, by the choice of a blaster inexperienced in concrete blasting operations and to which plaintiff initially ascribed liability for the overbreak damage. *Cf. Illinois Constr.*, 91–2 BCA ¶ 23,728, at 118,847–48 (emphasizing that contractor and subcontractor were experienced and "did not make foolish choices").

The court's acceptance of plaintiff's ardent last-ditch effort to include a claim for differing site conditions incident to trial was an extraordinary accommodation to plaintiff, granted over defendant's continuing objections, and was based primarily on the existence of one reference to a differing site conditions claim in the contracting officer's decision. That plaintiff effectively repudiated its own claim in its submission to the contracting officer does not fall on the shoulders of the court, and represents the continuation of plaintiff's *post hoc* development of theories under which it might recover.

Regarding plaintiff's contentions concerning the distinction between the contractor's entitlement to damages and the Government's liability, plaintiff has failed to demonstrate a Type I claim. Although liability may be decreased or avoided if defendant is able to show that the contractor performed inefficiently or unreasonably, plaintiff's failure to establish the requisite elements precludes its recovery. Because defendant submitted rational evidence that the Corps—after given notice that the overbreak constituted a differing site condition—could have eliminated entirely the FMB work and attendant costs, defendant's showing of the lack of notice to the Corps and plaintiff's decision to continue blasting with unchanged results is sufficient to meet its burden to demonstrate that plaintiff acted unreasonably and inefficiently. *See Schnip Bldg. Co. v. United States*, 227 Ct.Cl. 148, 163–65, 645 F.2d 950, 959–960 (1981); *cf. Dawco Constr.*, 18 Cl.Ct. at 693, 695 (finding defendant could not have made any changes even with notice).[7]

The court's refusal to find one expert more persuasive than the other was not a rejection of both experts' testimony. The testimony of the each blasting expert at trial did not fully address the respective opposing expert witness' testimony. In other words, the court was left to choose between two irreconcilable theories, neither of which fully accounted for the other. Plaintiff posits that the court must choose which expert to believe. *See Maitland Bros. Co. v. United States*, 20 Cl. Ct. 53, 64 (1990). However, "expert testimony is not binding on the court." *Burlington*

---

cluded when an inspection of referenced information would have revealed the truth." *A.S. McGaughan*, 24 Cl.Ct. at 668 (citation omitted) ("A contractor cannot rely on a misrepresentation in one part of the contract documents when another part directs it to information that qualifies or negates that misrepresentation.").

7. Although plaintiff is correct that the efficacy of other suggested methods of concrete removal was speculative, as having not been attempted, the court is satisfied with defendant's showing that the FMB work could have been eliminated because such work was not critical, given that the locks contained existing FMBs. Plaintiff elected to proceed: Plaintiff knew, or should have known, that it could suffer monetary consequences of continuing to blast with excessive

overbreak. Plaintiff also was aware that the Corps probably would have resisted delaying further blasting until such time as the cause of the overbreak was investigated. However, plaintiff could have chosen the latter course, which it had a right to do and which was the more prudent. Had plaintiff halted work in these circumstances, and had the Corps refused to investigate or ordered plaintiff to continue, irrespective of the overhead, the Corps would have been "on notice." Therefore, the Corps' insistence on timely completion notwithstanding, plaintiff unreasonably chose to continue blasting. The court's comparison to the work stoppage relating to the Teamsters strike at Brandon Road *is* illustrative of the fact that some flexibility in the schedule existed if the Corps was notified during the early stages of the project when the blasting operation occurred.

*Northern, Inc. v. United States,* 230 Ct.Cl. 102, 120, 676 F.2d 566, 577 (1982) (noting court has discretion to decide whether expert properly exercised judgment); *see also Norfolk Dredging Co. v. United States,* 175 Ct.Cl. 594, 620, 360 F.2d 619, 634, (1966) ("We do not always agree with advice given by expert witnesses, and in that sense we 'reject' it . . . , not because it is inadmissible, but because it is not convincing."). The court did not disregard the testimony of both experts in its entirety. Finding that each expert was not able to discount the other's view persuasively, so that the court could not reconcile their opinions and declare one to be dominant, the court was unable to resolve the matter by means of expert testimony.[8]

#### 2. *Type II differing site conditions*

Plaintiff puts forth a similar challenge with regard to its Type II claim. Noting that it is not obliged to bid based on the "worst-case" scenario, plaintiff states: "There is no evidence the Government provided the Court, other than [defendant's] contentions upon which the Court could conclude that [plaintiff's] expectations of uniform, sound, monolithic mass concrete were unreasonable, and not the conditions ordinarily encountered and generally recognized as inhering in the work." Plf's Br. filed Apr. 14, 1999, at 18. Plaintiff continues that "there is no evidence that the concrete's 'inherent characteristics' and the extent of overbreakage were reasonably foreseeable." *Id.* Focusing on the information that it did review in preparation for its bid, plaintiff asserts that the testimony reveals what it anticipated to be the subsurface conditions and notes that it is entitled to anticipate normal conditions.

Defendant responds that plaintiff failed to establish any of the required elements for a Type II claim—to wit (1) that the contractor was unaware of the physical condition, (2) that the contractor could not have anticipated the conditions it encountered from its general experience or from an inspection of the site, and (3) that the conditions encountered were not normal for the type of work. Defendant posits that plaintiff was aware of the

conditions within the concrete and "did not show that it did not know of the concrete's actual condition, because its blasters testified that they expected the conditions they encountered." Def's Br. filed May 14, 1999, at 31. Having failed to establish the first element, defendant contends that the remaining two elements are not relevant. "Because [plaintiff] expected the conditions it encountered, it cannot claim that it could not have anticipated the concrete's condition, nor can it credibly allege that the concrete varied from the norm." *Id.* (footnote omitted).

■ To succeed on a claim for Type II differing site conditions, plaintiff must demonstrate three elements: "First, plaintiff must show that it did not know about the physical condition. Second, plaintiff must show that it could not have anticipated the condition from inspection or general experience. Third, plaintiff must show that the condition varied from the norm in similar contracting work." *Lathan Co. v. United States,* 20 Cl.Ct. 122, 128 (1990); *see Youngdale & Sons Const. Co., Inc. v. United States,* 27 Fed.Cl. 516, 537–38 (1993) (finding contractor could recover if either unknown or unusual condition that varies from norm; unusual condition is one not reasonably anticipated after review of contract documents, site inspection, and general experience in area).

■ Plaintiff correctly characterizes *Weeks Dredging & Contracting, Inc. v. United States,* 13 Cl.Ct. 193, 219 (1987), *aff'd,* 861 F.2d 728 (Fed.Cir.1988), as a Type I case. However, plaintiff's obsession with the court's string-cite parenthetical ("noting that either a Type I or Type II differing site condition claim stands or falls upon what is indicated in the contract documents") (internal quotations omitted), neglects to recognize that the information contained within the contract documents has a direct bearing on what the contractor should expect with regard to a particular project. Although the contract documents are not dispositive, such documentation is relevant as a threshold to the contractor's knowledge

---

8. Plaintiff failed to meet its burden of proof, and the Government was prejudiced by the lack of

notice. These findings pretermitted the issue of causation.

and the Foreseeability of an unusual physical condition. "The alleged unknown and unusual physical condition must be one that was not foreseeable by a reasonable contractor after a review of the contract documents, a site investigation and the contractor's general experience." *J. Lawson Jones Constr. Co.,* 86–1 BCA ¶ 18,719, at 94,172; *see Youngdale & Sons Const. Co., Inc. v. United States,* 27 Fed.Cl. at 529, 537 ("In connection with entitlement under either of the foregoing types of differing site conditions, we stated the following in *Weeks:* '... a differing site condition claim stands or falls upon what is indicated in the contract documents.'" (quoting *Weeks Dredging,* 13 Cl.Ct. at 219)). "If information regarding the condition is contained in the contract documents, failure to review them will preclude recovery." J. Cibinic, Jr. & R. Nash, Jr., *supra,* at 512 (discussing Type II and citing *Youngdale & Sons,* which found that information contained in boring logs made available to contractor provided notice of condition). The contract documents in this case contained relevant information regarding subsurface conditions, which both blasting experts acknowledged.

█ The court's finding that plaintiff did not demonstrate that the concrete was *per se* unusual was in direct response to plaintiff's argument involving *Illinois Constructors Co.,* 91–2 BCA ¶ 23,728, at 118,845, which found that extreme difficulty in removal may alone be indicative of abnormal or unusual concrete. To recover for a differing site condition, the contractor must prove that it encountered conditions differing materially from those ordinarily encountered and generally recognized as inhering in the type of work provided for in the contract. Plaintiff also may demonstrate the existence of a differing site condition by showing that the materials reacted other than anticipated. Plaintiff argued, in its briefs and at trial, that the manner in which the concrete responded to blasting was *per se* unusual and thus indicative of a differing site condition. While admitting that it knew of the presence of construction joints and reinforcing steel,

which were not unusual in work of this kind, plaintiff posited that "it is instead the presence or existence of a characteristic or reaction of the concrete peculiar to these individual lock structures that caused blasting to be infeasible for removal of the concrete...." Plf's Mem. of Contentions of Law, filed Oct. 29, 1998, at 42–43. Plaintiff also noted that none of the FMBs "broke out" as expected, but, rather, reacted in such a way as significant overbreak was experienced at each location.

█ Plaintiff's burden in establishing a Type II differing site condition is "relatively heavy." *Charles T. Parker Const. Co. v. United States,* 193 Ct.Cl. 320, 333, 433 F.2d 771, 778 (1970); *see Youngdale & Sons,* 27 Fed.Cl. at 537–39 (discussing burden and plaintiff's failure of proof). Plaintiff's differing site conditions claim was developed *post hoc* and incident to trial. The testimony of plaintiff's witnesses evinced such development in that the deposition testimony presented by defendant during cross-examination indicated that the witnesses did not believe that the conditions were other than expected. Although testifying that the blasting results were unanticipated during trial, plaintiff's witnesses did not establish a causal relationship between the concrete conditions and the overblasting. Plaintiff's evidence failed to demonstrate that the intrinsic qualities of the concrete were unusual or that the concrete responded in an atypical manner to blasting.[9] In conjunction with the evidence that plaintiff's own inefficiencies and mistakes were causally related to the overblast, plaintiff did not meet its burden.

█ More importantly, plaintiff's claim is deficient with regard to notice. Although plaintiff was not required to know the cause of the differing site condition in order to recover, plaintiff was obligated to notice that it was is experiencing a differing site condition. In this contract, the differing site condition clause required that the contractor provide written notice to the contracting officer. "The purpose of such notice is to allow the Government an opportunity to investi-

---

9. Indeed, it was defendant's expert's opinion that the concrete had no other choice than to respond as it did considering the manner in which it was blasted.

gate and to exercise some control over the amount of cost and effort expended in resolving the problem." J. Cibinic, Jr. & R. Nash, Jr., *supra*, at 531 (citing *Charles T. Parker Constr. Co.*, 65–1 BCA ¶ 4780). Oral notice will suffice to waive the written requirement; the contractor, however, must prove that oral notice was provided. Similarly, actual or constructive notice waives the written requirement because the Government is not prejudiced by the contractor's failure to provide notice. "Even if the Government did not know of the condition in time to investigate, the contractor may still recover if the Government is not prejudiced by the lack of notice." J. Cibinic, Jr. & R. Nash, Jr., *supra*, at 533. The Government may show prejudice by demonstrating, *inter alia*, that it could have minimized the costs if it had received notice. *See id.*

In the instant case, actual notice was not given to the contracting officer or the contracting officer's representative. The court's March 31, 1999 opinion stated:

Although the timeliness of notice is dependent upon the attendant circumstances, no indication was registered that the plaintiff or Ludwig ever considered that plaintiff had come across differing site conditions. In fact, the evidence showed that plaintiff formulated its claim for differing site conditions *post hoc*. This conclusion is reinforced by the absence of any explicitly alleged claim for differing site conditions in either the October 2, 1995 claim letter, the July 3, 1996 letter, or plaintiff's complaint prior to amendment. The court credits plaintiff's assertion that identifying the cause of the overbreak may not have been possible without expert analysis; however, it was improvident of both plaintiff and Ludwig to continue blasting when faced with extensive, costly overbreak for which neither had an explanation. Assuming that plaintiff and Ludwig did not realize on the first blast that the overbreak resulted from anomalous conditions in the concrete, continuing to blast through the remaining seven FMBs was improvident.

*Fru–Con Const.*, 43 Fed.Cl. at 326–27 (footnote omitted).[10]

Plaintiff posited at trial that the Corps bore the responsibility of ordering plaintiff to discontinue the blasting operation. Plaintiff is mistaken. Although the Corps could do so under the contract, the Corps was not obligated to micromanage the project for plaintiff. It was plaintiff's responsibility to develop and execute a plan for, *inter alia*, the removal of concrete and installation of FMBs. Upon encountering a differing site condition or concrete that responded in an anomalous manner, it was incumbent upon plaintiff to notify the Corps. This would have permitted the Corps to assess the situation and consider potential remedial alternatives as suggested by witnesses at trial. The failure to provide notice was prejudicial to the Corps.

The court concluded: "If the extent of the overbreak were to constitute constructive notice to the Corps of a differing site condition, plaintiff would have to establish that the Corps knew of the cause of the overbreak." *Fru–Con Const.*, 43 Fed.Cl. at 327. This finding is tailored to the instant case, given the differing causes advanced by the parties' experts and the peculiarities of this matter. The evidence did not suggest that the Corps should have known, or did know, of the cause of the overbreak; rather, the evidence suggested that the Corps believed the concrete was sound and that plaintiff or Ludwig was responsible for the overblast damage. In *Schnip Building* the Court of Claims upheld the decision of the Armed Services Board of Contract Appeals, which stated: "'The appellant's ... extensive backfill and grade fill requirements could have been caused either by a subsurface condition or by improper blasting techniques. The fill needs, without more, do not prove the one or the other. The burden was on the appellant to prove to the Government why such extensive fill needs existed. The Government had no obligation to ferret out the reason.'" 227 Ct.Cl. at 162, 645 F.2d at 958–59. Although plaintiff attempts to minimize the failure to give

---

10. Contrary to defendant's assertions, plaintiff may not have been on notice of the alleged conditions after blasting of the first FMB. Notice may be imputed, however, prior to the completion of blasting for the remaining seven FMBs.

notice, it was significant. Given the lack of notice and recordation by plaintiff, as well as the remedial alternatives available to the Corps, the failure to provide notice precludes recovery.

### 7. *Excusable delay*

Plaintiff seeks the remission of liquidated damages totaling $206,950.00, which were assessed because of plaintiff's failure to reopen the locks on time. Focusing on out-of-context statements from the court's March 31, 1999 opinion, plaintiff contends that it suffered an excusable delay and therefore is entitled to protection from sanctions for late performance. Liquidated damages should be remitted based on the difference between plaintiff's entitlement to an extension of time and the assessment of liquidated damages for an excusable delay. Defendant responds: "The Court held that [plaintiff] did not prove that the heat or any other factor outside [plaintiff's] control caused it to finish late. Therefore, the Court by necessity considered and rejected [plaintiff's] liquidated damages claim." Def's Br. filed May 14, 1999, at 36.

 An excusable delay is one that is beyond the control of the contractor. "Beyond the control of the contractor" has been interpreted in multiple ways.

> If an event is considered to be *foreseeable* at the time of contracting and the contractor enters into the contract without making provisions to protect itself, the event may be held not to be beyond its control because it assumed the risk. The second application deals with events that the contractor could *prevent* from occurring. Such events are literally within the contractor's control. Finally, events may not be beyond the contractor's control if it could have *overcome* the effects of the event.

J. Cibinic, Jr. & R. Nash, Jr., *supra*, at 546. An excusable delay must result from an event for which the contractor bears no fault or responsibility and which was not foreseeable. Unless the Government retains control over the evidence, plaintiff bears the burden of establishing an excusable delay by a preponderance of the evidence. *Id.* at 583.

 An excusable delay can result from unusually severe weather. Nonetheless, "[a]n excusable delay should not be granted for unusually severe weather unless the contractor has shown that the weather actually had an *adverse impact* on critical work." J. Cibinic, Jr. & R. Nash, Jr., *supra*, at 556, 579 ("Even though a contractor can establish that an event or occurrence was unforeseeable, beyond its control, and occurred without its fault or negligence, it is not entitled to an excusable delay unless it can prove that the time lost delayed the completion of the job.") (citation omitted). Demonstration of an adverse impact is critical to plaintiff's recovery. "[T]he mere comparison of past statistical averages with weather during the period of performance without considering the actual impact on the work has been criticized as an 'unacceptable basis.'" *Id.* at 556, 556–57 (quoting *Essential Constr. Co.*, 78–2 BCA ¶ 13,314 and citing cases). Moreover, "[i]t is not sufficient to establish that some work was prevented; the work prevented must be work that will delay the overall completion of the job." J. Cibinic, Jr. & R. Nash, Jr., *supra*, at 579 (citations omitted).

 Plaintiff failed to keep records regarding the heat and its impact on critical activities. Plaintiff apparently considered this information superfluous, as evidenced by the testimony of John C. McDonald, plaintiff's Quality Control Manager, charged with completing such documentation. Although the court was inclined to credit the testimony of plaintiff's witnesses to the extent that it was a hot summer, and that several heat-related incidents occurred, the court did not find that the evidence depicted an impact of such heat on critical activities. The lack of documentation concerning weather is fatal to plaintiff's claim. *See G & H Mach. Co. v. United States*, 16 Cl.Ct. 568, 574 (1989) ("The court is left with naked allegations made by plaintiff's main witness that lack the documentary and testimonial backing necessary to support recovery."); *Park Constr. Co.*, 95–2 BCA ¶ 27,777, at 138,528–29 ("[I]t is well-established that mere assertions or allegations, standing alone, do not constitute proof of facts. . . . [C]ontemporaneous written records are presumed . . . to represent actual

job site conditions."). The record also reveals evidence suggesting that plaintiff's progress was affected by its own actions and inefficiencies with regard to, *inter alia*, the lifting lug design. In these circumstances, plaintiff has not demonstrated an excusable delay and is not entitled to remission of liquidated damages.

## CONCLUSION

Reconsideration enables a trial court to address oversights, and the court appreciates the opportunity to do so. The court carefully has considered plaintiff's motion and the parties' creative characterizations of the evidence presented, which, at times, distorted the record.[11] Reconsideration also presents a litmus for testing advocacy against a closed factual record. The parties' transgressions should cause them concern. Accordingly,

**IT IS ORDERED**, as follows:

1. Plaintiff's motion for reconsideration is granted to the extent that plaintiff is entitled to recover the stipulated contract balance of $60,000.00 and, if plaintiff has not recovered $82,780.00 in damages relating to the Teamsters strike at Brandon Road, the Corps shall remit this amount to plaintiff. Plaintiff's motion is otherwise denied.

2. The parties shall submit a Joint Status Report by August 6, 1999, regarding these two sums to enable entry of judgment.

3. Pursuant to RCFC 54(d), defendant, as the prevailing party, was to recover its costs. However, the judgment that will follow reconsideration will be in plaintiff's favor, although for an amount that defendant conceded. By August 6, 1999, the parties shall each file a supplemental brief setting forth their respective positions whether the law recognizes an award to defendant in these circumstances.[12]

---

11. *See, e.g.,* Def's Br. filed May 28, 1999, at 7 (misquoting testimony of plaintiff's witness).

12. Should the court conclude in the negative, the judgment will provide that each party shall bear its costs.