Wallace **OENGA**, Georgene Shugluk, Leroy Oenga, Sr., Michael Delia, Tony Delia, Joseph Delia, Jennie Miller, and Trinity Delia, Plaintiffs,

v.

The **UNITED STATES**, Defendant,

and

**BP Exploration (Alaska) Inc., ConocoPhillips Alaska, Inc., ExxonMobil Alaska Production Inc., Chevron U.S.A. Inc., and Forest Oil Corporation, Defendant–Intervenors.**

No. 06–491L.

United States Court of Federal Claims.

Feb. 8, 2011.

Raymond C. Givens, Bellevue, WA, for plaintiffs.

James M. Upton, U.S. Department of Justice, Washington, DC, with whom was Ignacia S. Moreno, Assistant Attorney General, for defendant. Jason A. Hill, U.S. Department of Justice, Washington, DC, and Roger Hudson, U.S. Department of Interior, Anchorage, AK, of counsel.

James E. Torgerson, Anchorage, AK, for defendant-intervenors.

## ORDER ON MOTIONS FOR RECONSIDERATION AND FOR ENTRY OF JUDGMENT

NANCY B. FIRESTONE, Judge.

In the opinion issued following trial in this case, *Oenga v. United States*, 96 Fed.Cl. 479 (2010), the court held that the plaintiffs ("Oengas") are entitled to damages for the defendant's ("government's") breach of trust stemming from the unauthorized use of the plaintiffs' native allotment by the defendant-intervenors (collectively referred to as "BPX" for the sake of simplicity). The court held that damages should be measured as fair annual rental for these unauthorized uses, which is properly calculated using the cost savings methodology presented by the plaintiffs' expert, Dr. Thomas Power:

> [T]hese calculations shall be based on the cost savings provided by the allotment as compared to construction of a bypass drill pad, using $5.3 million in 1988 dollars as the cost of such an alternative, a 7% nominal discount rate, and the 2.88% average [Consumer Price Index ("CPI")] as discussed by Dr. Power. The plaintiffs shall then allocate the total savings based on the percentage shares of Heald Point production for Lisburne, West Niakuk, and Raven. The plaintiffs are entitled to the entirety of the cost savings attributable to oil produced from these areas during time periods this court has found to be outside the scope of the lease and within this court's jurisdiction.

*Id.* at 547. The court allowed the parties to submit their proposed calculations according to these criteria and set a schedule for briefing on any motions for reconsideration.

All of the parties have submitted proposed damages calculations and motions for reconsideration. The defendant-intervenors have also filed a motion for clarification. The court shall address each of these motions for reconsideration and for clarification, plus additional issues raised in the parties' briefs regarding their proposed damages calculations.

## I. MOTIONS FOR RECONSIDERATION AND CLARIFICATION

### A. Standard of Review

 The applicable standards for reconsideration are set forth in Rule 59(a) of the Rules of the Court of Federal Claims ("RCFC"). RCFC 59(a) provides that reconsideration or rehearing may be granted as follows:

(A) for any reason for which a new trial has heretofore been granted in an action at law in federal court; (B) for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court; or (C) upon the showing of satisfactory evidence, cumulative or otherwise, that any fraud, wrong, or injustice has been done to the United States.

RCFC 59(a)(1). Put another way, "the court may grant a motion for reconsideration when there has been an intervening change in the controlling law, newly discovered evidence, or a need to correct clear factual or legal error or prevent manifest injustice." *Young v. United States*, 94 Fed.Cl. 671, 674 (2010) (citing RCFC 59(a)(1); *Bd. of Trs. of Bay Med. Ctr. v. Humana Military Healthcare Servs., Inc.*, 447 F.3d 1370, 1377 (Fed.Cir. 2006); *Fla. Power & Light Co. v. United States*, 66 Fed.Cl. 93, 96 (2005)). "The decision whether to grant reconsideration lies largely within the discretion of the [trial] court." *Yuba Natural Res., Inc. v. United States*, 904 F.2d 1577, 1583 (Fed.Cir.1990). "The court must consider such motion with 'exceptional care.'" *Henderson Cnty. Drainage Dist. No. 3 v. United States*, 55 Fed.Cl. 334, 337 (2003) (quoting *Fru–Con Constr. Corp. v. United States*, 44 Fed.Cl. 298, 300 (1999), *aff'd*, 250 F.3d 762 (Fed.Cir. 2000)). "A motion for reconsideration is not intended, however, to give an 'unhappy litigant an additional chance to sway' the court." *Matthews v. United States*, 73 Fed.Cl. 524, 525 (2006) (quoting *Froudi v. United States*, 22 Cl.Ct. 290, 300 (1991)). In that connection, a motion for reconsideration "does not provide an occasion for a party 'to raise arguments it could have properly raised previously, but did not.'" *Four Rivers Invs., Inc. v. United States*, 78 Fed.Cl. 662, 664 (2007) (quoting *Browning Ferris Indus., Inc. & Subsidiaries v. United States*, No. 05–738T, 2007 WL 1412087, at *1 (Fed.Cl. May 10, 2007)). "Motions for reconsideration must be supported 'by a showing of extraordinary circumstances which justify relief.'" *Caldwell v. United States*, 391 F.3d 1226, 1235 (Fed.Cir.2004) (quoting *Fru–Con Constr.*, 44 Fed.Cl. at 300).

**B. Plaintiffs' Motion for Reconsideration**

■ The plaintiffs have filed a motion for reconsideration arguing that the court should reverse its ruling following trial that the cost savings provided by the Oenga allotment should be compared to BPX's alternative cost of building a bypass road adjacent to Heald Point. The plaintiffs argue that such a bypass road was not a legally viable option for BPX because it would have blocked the plaintiffs' access to the water along the western side of Heald Point. The plaintiffs thus argue that the court must select the plaintiffs' preferred alternative, the subsea pipeline, for use in the cost savings analysis.

The defendant and defendant-intervenors contend that a bypass road would not have blocked the plaintiffs littoral access, as it could have been constructed to allow for a channel between the allotment and the bypass road, or, if there were no channel, the plaintiffs could access the water by crossing the bypass road. Further, the defendant-intervenors argue that the plaintiffs' littoral rights are not such that they could have prevented the state from allowing BPX to fill the tidelands adjacent to the allotment.

The court declines to reconsider its decision, which was based on the evidence and testimony presented at trial that the bypass road alternative presented a viable alternative for BPX to the use of the plaintiffs' allotment. The court heard the plaintiffs make this argument previously and, while the court did not explicitly discuss the issue of littoral access in the opinion, the court implicitly rejected the plaintiffs' argument when stating that "the court finds that this [bypass road] alternative would have been a real option for BPX given its exploration of a bypass road alternative in conjunction with the planned causeway." *Oenga*, 96 Fed.Cl. at 544. As the defendant-intervenors correctly point out, testimony showed that BPX had alternative ways of constructing the bypass road that would have allowed the plaintiffs to continue enjoying access to the water on the western side of their allotment. Of course, the court noted that raising tidelands in this manner would have posed some regulatory hurtles for BPX, as discussed *infra*

Part I.C.2 in the context of the cost of an alternative facility site. However, the court does not agree with the plaintiffs either as a matter of fact or as a matter of law that construction of a parallel bypass road would have been foreclosed, making it inappropriate for the court to use the cost of such an alternative in the cost savings approach to calculating damages in this case. Accordingly, the plaintiffs' motion for reconsideration is **DENIED**.

## C. Defendant's and Defendant–Intervenors' Motions for Reconsideration

### 1. Rate to be used in amortization calculation

■ The defendant has filed a motion for reconsideration of the court's directive that damages in this case be calculated using a 7% nominal discount rate in addition to the 2.88% CPI adjustment reflected in the lease.[1] The government notes that the plaintiffs' expert, Dr. Power, used a 7% nominal rate that included the 2.88% inflation adjustment. Put another way, Dr. Power used an approximately 4% real rate, to which he added the 2.88% inflation rate. The government argues that use of a 7% nominal rate in addition to a CPI adjustment would amount to an impermissible double recovery of the inflation factor.

The plaintiffs argue that the government's motion is not one fit for reconsideration, as it is an attempt to reargue an issue addressed at trial. The plaintiffs further urge, "The United States should not be heard chastising the Court for directing exactly the same final level of interest the United States' witnesses advocated at trial." Pls.' Resp. and Reply 17, ECF No. 311. The plaintiffs note that at trial the defendant's witnesses advocated use of a higher interest rate, which would have resulted in a lower damages calculation in the context of a valuation method the court has rejected.

Upon further review of the relevant testimony heard at trial, the court concludes that use of a 7% real rate, rather than a 7% nominal rate, is appropriate in this case. The court agrees with the defendant and defendant-intervenors that use of a 7% nominal rate in addition to the 2.88% CPI would result in double adjustment for inflation.[2] Use of a 7% real rate would not, however, result in double adjustment. Use of such a rate was supported by the testimony of former BPX employee Terry Obeney, who explained that BPX used a 7% real rate when deciding whether to fund projects. Tr. 1043, 1095–97. Mr. Obeney explained that the company used this "hurdle rate" in deciding where to invest its money, as having an expected 7% real rate of return was "the threshold to get you in the door to start having a conversation" about whether a project would be funded. Tr. 1095, 1097. Michael Truax, an expert for the plaintiffs, also acknowledged that Dr. Power's proposed 7% nominal rate was "a low rate relative to traditional standards seen in many real estate transactions and analyses like this." Tr. 1710. Dr. Kenneth Vogel, an expert for the defendant, also advocated using a 7% real rate, which, he explained, would have produced a nominal rate of about 11% once inflationary expectations were incorporated. Tr. 2135. For these reasons, the court concludes that use of a 7% real rate plus inflation, as measured by the average CPI, is appropriate in this case.

The court notes that this represents a divergence from the initial opinion in this case, in which the court stated that the calculation should involve "a 7% nominal discount rate, and the 2.88% average CPI as discussed by Dr. Power." *Oenga*, 96 Fed.Cl. at 547. However, upon further review, the court acknowledges that it conflated the 7% nominal rate used by Dr. Power in his analysis with the 7% real rate used by BPX in its investment decisions.[3] The court did not intend to

---

**1.** he defendant-intervenors also raise this issue in their briefing on damages, and in their reply in support of their motions for reconsideration and clarification, stating that they agree with the defendant's position on the issue.

**2.** Indeed, Dr. Power explained at trial, "A nominal rate includes some measure of expected infla-

tion, and [a] real rate assumes that [the] inflation rate[] is effectively zero, and inflation will be taken into account some other way." Tr. 1502–03.

**3.** A noted, *infra* note 8, this change does not affect the math in the calculations performed by

double count for interest by using both a 7% nominal rate, which includes an inflationary expectation, plus an additional inflation factor. Rather, the court intended damages to be calculated using a 7% real rate plus CPI. The court finds support from numerous witnesses, including experts for both the plaintiffs and defendant, supporting the use of a 7% real rate. Most importantly, Mr. Obeney's testimony supports the conclusion that a 7% real rate is the rate BPX would have used in making its decision whether to enter into a lease with the Oengas or take on the costs of an alternative project.[4] Accordingly, the defendant's motion is **GRANTED–IN–PART** to the extent that the court has revised its prior holding, however, the effective rate applied in the amortization calculation remains the same as the rate previously ordered.

### 2. Cost of Alternative

■ The defendant-intervenors have moved for reconsideration of the court's opinion with regard to the cost of the bypass road alternative to use of the plaintiffs' allotment. The court found after trial that it was appropriate to use the upper end of the price range estimate by BPX in 1988 of $3.8 to $5.3 million. BPX argues that the court should select a price of $4.4 million, rather than $5.3 million, because $4.4 million was the low-end estimate for the cost of the wider of two proposed roadways. BPX does not object to the use of a price figure from the wider roadbed scenario, but argues that the court must use the lower end figure for this roadway, rather than the higher end figure because "it would be irrational to expect BPX[ ] to have been willing to pay the Oengas more than it would have cost BPX[ ] to build the bypass using gravel available to it from the Duck Island Pit given that it could acquire that gravel for more than $900,000 less than gravel sourced from the Put Mine # 23 location." Def.-Intervs.' Mot. For Recons. 3, ECF No. 306–1.[5]

The plaintiffs contend that this issue is improper for reconsideration because the defendant-intervenors had opportunity to raise it at trial, and, to the extent they did raise it at trial, the issue was argued and decided. The plaintiffs further argue that the motion for reconsideration should fail because the court arrived at its decision to use a figure at the upper end of the estimated price range because of the risk of "additional permitting costs and approvals required for the bypass alternative." Pls.' Resp. and Reply 18, ECF No. 311 (quoting *Oenga*, 96 Fed.Cl. at 546).

The plaintiffs are correct. Not only is this an issue that the defendant-intervenors never raised at trial, the court explicitly stated in its opinion following trial that the reason the $5.3 million figure is appropriate for use in the damages calculation is because of the additional benefits provided by the Oenga allotment, namely the reduced risk in terms of permitting and approvals afforded by use of an existing landmass as opposed to raising tidelands to create a new roadway. For these reasons, the defendant-intervenors' motion for reconsideration is **DENIED**.

### 3. Amortization Period and Future Damages

■ The defendant-intervenors have filed a motion asking the court to clarify, in essence, that damages in this case are limited to the amount of the cost savings provided by the allotment. BPX argues that the cost savings provided by the allotment was a "one-time, all-in amount." Thus, the defendant-intervenors argue, if this one-time cost is amortized over the sixteen years, after these sixteen years of payments no additional damages could be due. "When the 16th year's payment has been made, Plaintiffs will be fully compensated, in advance, for Defendant–Intervenors' future, as well as past, use of the Allotment for development of reservoirs other than the Greater Niakuk Accu-

---

Dr. Power in the plaintiffs' post-trial submissions.

**4.** The court does not find convincing the government's *post hoc* argument that this higher interest rate, for which its expert advocated at trial, was properly applicable only in the context of a different valuation theory, in which application of a higher interest rate would have benefitted the government by contributing to a lower damages calculation.

**5.** The defendant has made this same argument in its proposed damages calculation. Def.'s Damages Br. 3–4, ECF No. 308.

mulation." Def.-Intervs.' Mot. for Clarif. 5, ECF No. 305.[6]

Relatedly, BPX argues that amortization over sixteen years is inappropriate because, although the projected life of the project on the plaintiffs' allotment was sixteen years, the damages calculation should be performed using a forty-five-year amortization period. The defendant-intervenors imply that this is the only way the plaintiffs could claim future damages related to unauthorized uses of their allotment.

The plaintiffs respond by urging that BPX's arguments are improper because they should have been raised at trial. The plaintiffs further contend that the amortization using BPX's sixteen-year projected project life produces a rental figure. The plaintiffs argue that a lessee cannot continue using property rent free after the expiration of the estimated project life, "especially when it was the *lessee* who chose that estimated project life." Pls.' Resp. and Reply 19, ECF No. 311 (emphasis in original). Responding to the defendant-intervenors' argument that damages should be calculated using a forty-five year amortization period, the plaintiffs note again that it was BPX that initially put forth the sixteen-year project lifespan, in its submission to the Corps of Engineers. The plaintiffs further note that this issue was not raised at trial and cannot be raised now.

The court agrees with the plaintiffs on both of these issues. The calculation of damages in this case involves considering the choices that confronted BPX at the time that it committed to developing the plaintiffs' allotment. The court has found that the appropriate measure of damages in this case involves the comparison BPX made at that time between the plaintiffs' allotment and other development options available to it. In this connection, the court found that BPX's next-best alternative to the use of the plaintiffs' land was to build an adjacent bypass road at a cost of up to $5.3 million. The court has also found that, at that time, BPX envisioned a project with a sixteen-year lifespan; there was no evidence presented at trial

to suggest otherwise. As the plaintiffs correctly note, it was BPX that presented this duration as the expected lifespan of the project. The company used that expected duration of the product to weigh its investment decision by comparing an annual rental payment against the annualized expense of a one-time cost.

■ The calculation of damages involves determining a fair annual rental based on this $5.3 million cost savings and this sixteen-year projected life span. The calculation that results from amortizing this one-time cost over the projected project life produces a fair annual rental amount. That amount is the fair annual rent payable for the term of the lease, whether the lease were to last one year, sixteen years, or forty-five years. The fair annual rent does not change because the total rent paid has exceeded what would have been the one-time construction cost of a bypass road. That BPX underestimated the duration of its project's life does not reduce the fair annual rent due to the plaintiffs now and in the future. Nor does it eliminate the possibility of future damages for future unauthorized use of the plaintiffs' land. In other words, damages awarded in this case cover only past unauthorized use of the allotment. Future use exceeding the scope of the lease does not become authorized, rather than unauthorized, simply because of the payment of damages related to *past use* exceeding the scope of the lease. The defendant-intervenors' motion to this effect is thus **DENIED**.

## II. ADDITIONAL ISSUES RAISED IN DAMAGES BRIEFING

### A. Authorized Versus Unauthorized Allocation of West Niakuk Oil

In their brief on damages, the defendant-intervenors argue, "Dr. Power properly subtracted from the 'unauthorized production' the oil produced from West Niakuk after mid-December 2007. But he failed to add those barrels to the 'authorized' production." Def.-Intervs.' Br. on Damages 4, ECF No. 309. The defendant-intervenors point to the

---

6. The defendant has made this same argument in its proposed damages calculation. Def.'s Dam-

ages Br. 3, ECF No. 308.

damages calculations performed by Dr. John Hekman, which BPX contends corrects this alleged error, "which has the effect of slightly increasing the percentage of authorized production and decreasing the percentage of unauthorized production." *Id.* The plaintiffs, pointing to one of the spreadsheets prepared by Dr. Power, argue that this statement is incorrect.

Upon examination of the spreadsheets prepared by Dr. Power and Dr. Hekman, the court concludes that the plaintiffs are correct. Dr. Power's spreadsheet accounts for post-December 2007 West Niakuk production in the same manner as Dr. Hekman's, by both subtracting this production from the unauthorized use column and adding it to an authorized use column. The only difference is that Dr. Power created a separate column, entitled "Authorized Other Volumes Not Subject to Damages," for this post-December 2007 West Niakuk oil, while Dr. Hekman added this oil into his column titled "Adjusted Niakuk." *See* Pls.' Br. on Damages 8, ECF No. 299; App. to Def.-Intervs.' Br. on Damages 3, ECF No. 309-1. Thus, the court does not agree with the defendant-intervenors' contention that Dr. Power incorrectly allocated the West Niakuk production for that time period.

## B. Pre–Trial Agreement as to 150,000 Barrels of Niakuk Oil

The defendant-intervenors next state, "[B]efore the trial the parties settled a disagreement as to the amount of total production from Niakuk versus West Niakuk by agreeing to reallocate 150,000 barrels of production that Plaintiffs had attributed to West Niakuk to Niakuk." Def.-Intervs.' Br. on Damages 4, ECF No. 309. The plaintiffs acknowledge that the defendant-intervenors are correct regarding this pre-trial stipulation and that omission of this correction in the plaintiffs' initial damages calculation was in error. The plaintiffs have filed a revised damages calculation reflecting this adjustment. *See* App. to Pls.' Resp. and Reply 4, ECF No. 311-1.

## C. Adjustment for Rent Already Paid

Finally, the defendant-intervenors argue that the final damages calculation should include "an adjustment for rent already paid by Defendant–Intervenors for the 'unauthorized' use of the Allotment from 1995 to present." Def.-Intervs.' Br. on Damages 5, ECF No. 309. BPX's theory is that its payments, as determined by past appraisals, have included compensation for uses of the allotment that exceeded the scope of its lease. The plaintiffs respond by explaining that such an offset could be relevant if the court were charged with determining the fair annual rental for the authorized use of the allotment, "[b]ut such an offset has no place in the calculation of breach of trust damages against the United States for failing to take action regarding *unauthorized* use of the Allotment." Pls.' Resp. and Reply 20, ECF No. 311 (emphasis in original).

The court agrees with the plaintiffs. The rent paid thus far to the Oengas has covered only the authorized use of the allotment. The court has held that damages are to be calculated by determining fair annual rent for *all* uses of the allotment and then allocating that rent between authorized and unauthorized uses based on their respective share of the oil produced through Heald Point. Damages are only due for the portion of the rent attributable to unauthorized production. Calculating damages this way negates the need for any further offset of rent actually paid, as, by definition, the portion of the rent due for authorized uses has already been separated from the portion due for unauthorized uses. The rent BPX has historically paid to the plaintiffs has covered only authorized uses. The damages to be paid in this case cover only unauthorized uses. For these reasons, the court is unmoved by the defendant-intervenors' argument that the damages be offset by some amount of the rent paid to the plaintiffs.[7] No further offset is warranted.

## III. CONCLUSION: DAMAGES AWARD

Having considered all of the damages submissions put forth by the parties, for

---

7. The court does note that such an offset could be warranted if BPX had paid rents exceeding the fair market value of its authorized use of the allotment, which was not the case.

the foregoing reasons the court accepts the revised damages calculation provided by the plaintiffs, which utilizes the $5.3 million cost of the bypass road alternative, applies a 7% amortization rate, a 2.88% inflation rate,[8] and a sixteen-year expected project life span, and which reflects the adjustment required by the parties' pre-trial stipulation.[9] The Court determines that plaintiffs are entitled to recover damages in the amount of $4,924,000. The court directs the clerk to enter judgment in favor of the plaintiffs and against the defendant in that amount.

**IT IS SO ORDERED.**

8. In his proposed damages calculation submitted after trial, Dr. Power, in keeping with the court's initial ruling, applied a 7% nominal rate plus the 2.88% CPI factor. However, his calculation is not changed by the court's revised ruling that the appropriate rate is a 7% real rate plus the 2.88% CPI factor.

9. The plaintiffs have also requested "a determination of general entitlement to an award of costs and attorney fees under 28 U.S.C § []2412." Pls.' Mot. on Damages 2, ECF No. 299. The plaintiffs note that under the Equal Access to Justice Act ("EAJA"), the statute cited, the specific amounts of costs and fees may not be determined until the time for appeals has expired. Indeed, EAJA provides that a party seeking an award of fees and other expenses shall submit its application "within thirty days of final judgment in the action," 28 U.S.C. § 2412(d)(1)(B), and defines "final judgment" as "a judgment that is final and not appealable," 28 U.S.C. § 2412(d)(2)(G). The court agrees with the defendant that it is not yet the appropriate time for the court to address the potential award of costs and fees pursuant to EAJA in this case.